Due 9/17
CV-04-3?? (ARR)

To Be Argued by:
Sally Wasserman
(15 minutes requested)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-----------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,          :
                Respondent,

                                :          Kings County
         -against-                                    Indictment No. 6791/99

                                :
LONNIE TILLERY,
                Defendant-Appellant.          :          A.D. Number 00-06289
-----------------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D. N.Y.
★   OCT 1 8 2004   ★
BROOKLYN OFFICE

'02 JUL 19 AM 11: 43
KINGS COU...
...A.. OF FILE...
RECEIVED

## BRIEF AND APPENDIX FOR THE APPELLANT

Sally Wasserman
Attorney for Mr. Tillery
352 Seventh Avenue
Suite 1101
New York, New York 10001
(212) 564-7406

July 20, 2002

## QUESTIONS PRESENTED

1. WHETHER THE APPELLANT'S CONVICTION MUST BE REVERSED AND THE INDICTMENT AGAINST HIM DISMISSED BECAUSE HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO COUNSEL WERE VIOLATED BY THE RUSE CRAFTED BY THE POLICE TO GAIN UNFETTERED ACCESS TO HIM FOR THE PURPOSES OF INTERROGATION AND, FURTHER, BECAUSE THE TRIAL USE OF THE STATEMENT GAINED THEREBY DIRECTLY CONTRIBUTED TO THE JURY'S VERDICT OF GUILT?

2. WHETHER THE APPELLANT'S CONVICTION MUST BE REVERSED BECAUSE THE PROSECUTION IMPERMISSIBLY ELICITED THE FACTS OF THE APPELLANT'S INVOCATION OF HIS RIGHT TO REMAIN SILENT AND, FURTHER, BECAUSE THE TRIAL USE OF THE APPELLANT'S INVOCATION OF HIS RIGHT TO REMAIN SILENT DIRECTLY CONTRIBUTED TO THE JURY'S VERDICT OF GUILT?

3. WHETHER THE APPELLANT'S CONVICTION MUST BE REVERSED BECAUSE THE PROSECUTION FAILED TO DEMONSTRATE THAT THERE EXISTED AN INDEPENDENT SOURCE FOR THE IDENTIFICATIONS OF THE APPELLANT BY PROSECUTION WITNESSES NEGESTI CHUNG AND JAMAL SONGUI. IN THE ALTERNATIVE, WHETHER THIS COURT IS URGED TO HOLD THIS APPEAL IN ABEYANCE AND REMAND THE CASE FOR AN INDEPENDENT SOURCE HEARING?

4. WHETHER THIS COURT SHOULD REVERSE THE APPELLANT'S HOMICIDE CONVICTION BECAUSE THE PROSECUTION FAILED TO PROVE INTENT BEYOND A REASONABLE DOUBT AND ALSO BECAUSE, IN ANY EVENT, THE JURY'S VERDICT OF GUILT WITH REGARD TO THE CHARGE OF FIRST-DEGREE MURDER WAS AGAINST THE WEIGHT OF THE EVIDENCE?

5. THE APPELLANT'S CUMULATIVE SENTENCE OF 46⅓ TO LIFE IS ILLEGAL AND ALSO UNCONSTITUTIONALLY HARSH AND EXCESSIVE?

# INDEX

QUESTIONS PRESENTED............................................................................................ i

STATEMENT PURSUANT TO 5531 .......................................................................... ii

STATEMENT OF FACTS........................................................................................... 1

    The Pretrial Hearings.............................................................................................. 2

    The Prosecution's Case........................................................................................... 3

    The Court's Ruling.................................................................................................. 5

    The Trial.................................................................................................................. 6

    The Prosecution's Case........................................................................................... 6

    The Verdict And Sentence....................................................................................... 15

ARGUMENT-

POINT I-

THE APPELLANT'S CONVICTION MUST BE REVERSED AND THE INDICTMENT AGAINST HIM DISMISSED BECAUSE HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO COUNSEL WERE VIOLATED BY THE RUSE CRAFTED BY THE POLICE TO GAIN UNFETTERED ACCESS TO HIM FOR THE PURPOSES OF INTERROGATION AND, FURTHER, BECAUSE THE TRIAL USE OF THE STATEMENT GAINED THEREBY DIRECTLY CONTRIBUTED TO THE JURY'S VERDICT OF GUILT............................ 16

POINT II-

THE APPELLANT'S CONVICTION MUST BE REVERSED BECAUSE THE PROSECUTION IMPERMISSIBLY ELICITED THE FACTS OF THE APPELLANT'S INVOCATION OF HIS RIGHT TO REMAIN SILENT AND, FURTHER, BECAUSE THE TRIAL USE OF THE APPELLANT'S INVOCATION OF HIS RIGHT TO REMAIN SILENT DIRECTLY CONTRIBUTED TO THE JURY'S VERDICT OF GUILT................................................ 21

POINT III-

THE APPELLANT'S CONVICTION MUST BE REVERSED BECAUSE THE PROSECUTION FAILED TO DEMONSTRATE THAT THERE EXISTED AN INDEPENDENT SOURCE FOR THE IDENTIFICATIONS OF THE APPELLANT BY PROSECUTION WITNESSES NEGESTI CHUNG AND JAMAL SONGUI. IN THE ALTERNATIVE, THIS COURT IS URGED TO HOLD THIS APPEAL IN ABEYANCE AND REMAND THE CASE FOR AN INDEPENDENT SOURCE HEARING....................................................................................................................... 23

POINT IV-

THIS COURT IS URGED TO REVERSE THE APPELLANT'S HOMICIDE CONVICTION BECAUSE THE PROSECUTION FAILED TO PROVE INTENT BEYOND A REASONABLE DOUBT AND THE JURY'S VERDICT OF GUILT WITH REGARD TO THE CHARGE OF FIRST-DEGREE MURDER WAS AGAINST THE WEIGHT OF THE EVIDENCE.......... 27

POINT V-
THE APPELLANT'S SENTENCE IS ILLEGAL AND UNCONSTITUTIONALLY HARSH
AND EXCESSIVE........................................................................................................... 30

CONCLUSION-
FOR ALL OF THE FOREGOING REASONS, THIS COURT IS URGED TO REVERSE THE
APPELLANT'S CONVICTION AND DISMISS THE INDICTMENT AGAINST HIM OR, IN
THE ALTERNATIVE, HOLD THIS APPEAL IN ABEYANCE AND REMAND THE CASE FOR
AN INDEPENDENT SOURCE HEARING, OR, IN THE ALTERNATIVE SUBSTITUTE
CONCURRENT SENTENCES FOR THE CONSECUTIVE SENTENCES
IMPOSED.......................................................................................................... 33


APPENDIX-
Kings County Indictment Number 6791/99

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,     :
          Respondent,

                               :     Kings County

         -against-                Indictment No. 6791/99

                               :

LONNIE TILLERY,                       A.D. Number 00-06289
          Defendant-Appellant.    :
------------------------------------------------------------------X

## STATEMENT PURSUANT TO 5531

1. The Indictment Number Below was 6791/99.

2. The full names of the parties are The People of the State of New York and Lonnie Tillery.

3. The action was commenced in the Supreme Court of the State of New York, Kings County.

4. This appeal concerns a judgment of the Supreme Court, Kings County, rendered June 27, 2000, convicting the appellant Lonnie Tillery, after a jury trial, of murder in the first degree, criminal possession of a weapon in the second degree, and a violation of probation (two counts). The appellant was sentenced to the following consecutive terms of imprisonment: an indeterminate term of 25 to life for the homicide, a definite term of 15 years for the weapon possession, an indeterminate term of 1⅓ to 4 years for one of the probation violations (Goldberg, J.). On the other probation violation, the appellant was sentenced to an indeterminate term of 5 to 15 years (Gerges, J.). The appellant's cumulative sentence is thus 46 ⅓ years to life (Goldberg, J.). The appellant is currently incarcerated pursuant to this judgement of conviction.

5. There were no co-defendants in this case. The appellant's case was severed from co-defendant Shiloh Hylton's case in advance of trial.

6. There is an appendix to this brief.

## STATEMENT OF FACTS

In the early morning hours of April 4, 1999, Wendell Rosiclair sustained a fatal gunshot wound inflicted in the course of a robbery perpetrated on East 35th Street in Brooklyn. The prosecution alleged that Lonnie Tillery, hereinafter referred to as the appellant, was the shooter. In connection with this incident the appellant was charged, by Kings County Indictment Number 6791/99, with first-degree murder and criminal possession a weapon in the second degree.

The posture of this case is somewhat unique. At the time that he was located by the police, the appellant was in custody in upstate New York on unrelated charged. The downstate police and the Office of the Kings County District Attorney crafted a ruse designed to bring the appellant into custody without triggering his rights to counsel. The police caused the appellant to be released on his own recognizance on the upstate matter and then transported him to Brooklyn. Once in Brooklyn, the appellant was interrogated on the instant incident and allegedly placed himself at the scene but denied participation in the robbery and shooting of the decedent. This interrogation violated the appellant's right to counsel: the appellant's release in his own recognizance upstate and transport to Brooklyn was a thinly disguised ruse designed to grant the New York City police unfettered access to the appellant without the impediment of counsel. The trial use of the statement thus violated the appellant's State and Federal constitutional rights to counsel, due process and a fair trial.

## The Pretrial Hearings

On May 22, 1999, the court conducted a combined <u>Huntley</u>, <u>Dunaway</u> and <u>Wade</u> hearing upon the appellant's suppression motions. At the conclusion of the hearing the court, in a decision read into the record, denied the appellant's suppression motions in their entirety (Minutes Dated May 22, 1999 at 132-34). On May 24,1999, the court conducted a <u>Sandoval</u> hearing upon the appellant's motion and again read its decision into the record (Minutes of May 24, 1999 at 24). The constitutionality of the court's ruling upon the issues presented by the <u>Dunaway</u>, <u>Wade</u> and <u>Sandoval</u> hearings are not contested by the appellant at this time. Accordingly, the testimony and discussion related to those issues are not detailed herein.

The appellant contests herein the constitutionality of the trial use of the post-arrest statement attributed to him. At the behest of the downstate police, the appellant was released in his own recognizance on a upstate matter and then transported to Brooklyn. Once in custody in Brooklyn, the appellant was interrogated. In a statement to the police, the appellant placed himself at the scene. This interrogation of the appellant in the absence of counsel violated the appellant's State and Federal constitutional rights. The hearing testimony relevant to the unconstitutionality of the circumstances of the appellant's interrogation is summarized below. All citations in this portion of the brief are to the transcript of the proceeding conducted on May 22, 1999.

<u>The Prosecution's Case</u>

Detective **MICHAEL HINRICHS** was assigned to investigate the instant homicide (Hinrichs: H. 10).[1] Pursuant to that investigation, on July 27, 1999, the detective learned that the appellant was being held on unrelated charges in Rome, New York (Hinrichs: H. 29-30). The detective contacted the Office of the Kings County District Attorney and the Rome District Attorney. The purpose of those conferences was "to try to work out when we could have, you know, we could speak to or arrest Mr. Tillery." (Hinrichs: H. 31). The detective claimed that, allegedly as a matter of pure coincidence, on August 17, 1999:

"One of the deputies in the jail who I had spoke to on the 27[th] called my office, and he said that **Mr. Tillery was going to be released or ROR'd on his pending case upstate, and that he was going in fact to be let out of jail, and somebody has to come up right away and get him.** He can hold him for a certain amount of time, but someone has to come up right away."

(Hinrichs: H.31) (emphasis supplied). The detective and another officer, Detective Hector, traveled to Rome, New York. During transport, the appellant, in answer to a question from Detective Hinrichs, stated that he believed was being brought back to Brooklyn on an outstanding bench warrant (Hinrichs: H. 32).

At the time of transport, it was the detective's understanding that the appellant still had a pending case upstate (Hinrichs: H. 70). The detective was also aware that a bench warrant had been issued for the appellant in a Brooklyn case. The detective was aware that the appellant "was to be sentenced

---

[1]  Numbers refer to the pages of the transcript. Witness' names are noted accordingly.

and he bench warranted on the case." (Hinrichs: H. 70). Despite this warrant, the detective claimed that he did not believe that the appellant was represented by counsel in Brooklyn and, further, that he was "not sure" about counsel on the Rome case (Hinrichs: H. 71). The detective claimed that the appellant's release in Rome was not formally arranged. He alleged that "before we could make a decision on what actually to do, the deputy called up and said he was being released and we had to go up there." (Hinrichs: H. 73-74).

The appellant was brought to the 67th Precinct at about 5:00 p.m. on August 17, 1999 (Hinrichs: H. 33). At about 8:30 p.m., the police adminstered the _Miranda_ warnings to the appellant and commenced interrogation (Hinrichs: H. 48-53). The appellant refused to write or sign anything but agreed to make a statement. The detective handwrote the appellant's statement. The following, in sum and substance, is the statement attributed to the appellant.

The appellant was alleged to have stated that he had been at a dance club with "Arthur." Arthur there saw a man that he knew. Arthur learned that an individual at the club was no longer a "Crip" and an argument ensued. Arthur decided to rob the man's Rolex watch. Once the party at the club concluded, the appellant left the club with Arthur and three other individuals. Their driver followed a white jeep. Arthur and another individual followed when the occupants exited the white jeep. Arthur and the second perpetrator produced guns and commenced a robbery of the people on the street. The two had started a return to their car when the second perpetrator yelled, "He's reaching." Arthur turned and fired one shot and the individual from the club (the Crip) fell to the floor. Arthur and the second perpetrator returned to their car and left the scene. The appellant was later dropped off on Clarkson Avenue. After the appellant learned that he had been linked to the case, he left for Virginia and then stayed in upstate New York (Hinrichs: H. 56-58).

4

The appellant conferred with the mother of his child after he was interrogated. At the conclusion of their discussion, the appellant repeated his refusal to sign anything prepared by the police (Hinrichs: H. 58). The appellant stated that he feared that Arthur would learn of the signed statement and accuse the appellant of the charged crime (Hinrichs: H. 60). During the investigation, the police learned the full name of the person referred to by the appellant as "Arthur" (Hinrichs: H. 83). After the conclusion of interrogation, the detective conducted the line-ups in this case.

## The Court's Ruling

At the conclusion of the hearing, the defense argued that the statements attributed to the appellant had to be suppressed because the manner in which they were obtained violated the appellant's right to counsel. Defense counsel noted that at the time of interrogation, the appellant had open cases both upstate and downstate and explained that: **"The release, such as it was to police custody, was designed to preclude my client's right to counsel. It was also designed to circumvent him having access to either of his two attorneys . . . "** (H. 125) (emphasis supplied). The court itself noted that:

**"There was testimony they conferred with the District Attorney's office in Kings County and the District Attorney's office in Rome, New York, so I assume that they were aware of the status of the cases and probably obtained advice from the District Attorney's office as to how to proceed."**

(H. 125). The defense agreed and argued that, "in view of all that . . . what we can safely conclude, this was a design, either orchestrated by the Brooklyn District Attorney's office in cahoots with the

67th Precinct, or this was something of their own device to circumvent my client's right to counsel." (H. 126).

In response, the prosecution relied on People v. Bing, 67 N.Y. 2d 331 (1990), and argued that a "defendant who is not in custody in the pending case may be questioned in the absence of his attorney on an unrelated matter." (H. 130-31). The prosecution's argument, however, ignored the chicanery by the police and two prosecutorial agencies that resulted in the sham release of the appellant from custody. Though the detective denied any such premeditation, the court's comments established that the court itself rejected the notion that the appellant's timely release from custody in upstate New York was pure serendipity.

Despite this cogent, compelling and ultimately correct argument by the defense, the hearing court denied the appellant's suppression motion in a decision issued from the bench, the court found that the "law allows the police to waive the defendant's right to counsel attaches [sic] if there is independent cause to arrest on another charge. " (H. 133).


## The Trial

### The Prosecution's Case

On the night of April 3,1999, **RODNEY FRANCOIS** was working as a disc jockey at a club called Trinity on Clarkson Avenue in Brooklyn (Francois: 67-68). Helping him that evening, were his friends Wendell Rosiclair, Jamal and Kevin.[2] The friends and some women with them were celebrating Kevin's birthday that night. Over the course of their time at the club, they consumed several bottles of champagne and a liquor beverage known as Alize. That night, Francois also smoked

---

[2]The Kevin referred to by Francois was prosecution witness Kevin Caesar.

marijuana (Francois: 147). By about 5:00 a.m. on April 4, 1999, the club closed and the friends left. Francois had consumed three to four cups of champagne but claimed that he was not drunk (Francois: 69-73, 134-35).

Francois loaded his records into Rosiclair's white Land Cruiser truck and the friends left Clarkson Avenue in the truck and a green Mazda driven by Kevin. The first to be dropped off was a woman named Niki.[3] She was brought to her home on 35th Street, between Clarendon and Cortelyou Road. During the ride, Francois noticed a jeep following behind them. Wendell, Jamal, Kevin and Niki got out of the car at Niki's home. Standing on 35th Street, Francois saw someone walk past with a small revolver saying, "Run the rollees, run the watches." (Francois:79, 90). There were three other armed men with him (Francois: 89-90). Francois understood these words to mean that a robbery was underway. Rosiclair and Kevin both wore Rolex watches (Francois: 133).The gunman hit Rosiclair with the gun. Rosiclair worked to remove the chain that he was wearing and was shot by the gunman at close range, from a distance of five or six inches (Francois: 81-84, 87). Francois claimed to have gotten a good "glimpse" of the gunman's face (Francois: 82).

After the shooting, Rosiclair fell to the ground and the four men fled to the jeep (Francois: 90-91). Francois had never seen any of the four men before, not at the Trinity club that night or on any prior occasion (Francois: 90, 139, 158). Francois recalled that the shooter did not wear a mask. He stated that one of the other perpetrators wore a beige scarf and hat. He identified the hat and scarf at trial (Francois: 126). At trial and at a line-up conducted some four months after the incident at issue, Francois identified the appellant as the shooter (Francois: 92, 131). Francois denied that he had seen a picture of the alleged shooter in a "Most Wanted" advertisement placed by the police in the

---

[3]The Niki referred to by Francois was prosecution witness Negesti Chung

Daily News (Francois: 172).

**LISA SMITH** was among those celebrating Kevin Caesar's birthday at the Trinity Club on the night of April 3, 1999 (Smith: 183-85). She claimed that she consumed no alcohol and smoked no marijuana during the hours that she spent at the club (Smith: 187). She left the club with the group at about 5:00 a.m. and traveled in the Mazda to Niki Chung's house. During the ride, she noticed a black jeep following them. Smith stayed in the car on 35th Street. From a distance of 8 or 9 feet, Smith watched as 3 armed men emerged from the black jeep. She recognized one of the men, a man in a red "Coogie" brand sweater from the club (Smith: 194, 196, 200). At trial, she could not recall if the man in the red sweater wore a mask. She recalled that a second of the men, a man in a beige suit, wore a scarf up to his nose. Smith watched as one of the men positioned a gun near Chung's face. Chung gave the man her earrings. Smith saw the man in the red Coogie sweater shoot Wendell Rosiclair while Rosiclair tried to remove the chain around his neck. After the shooting, the men ran back to the jeep and drove off. At trial, Smith identified the beige hat and scarf worn by one of the perpetrators (Smith: 215).

**KEVIN CAESAR** also recalled the events of his 1999 birthday at the Trinity club (Caesar: 228-30). While celebrating, he consumed two glasses of Champagne. He admitted that he "felt a little buzz" but claimed that he was not drunk that night (Caesar: 231). Caesar was on 35th Street in front of Chung's house when he saw four men approaching. One man wore a gray sweat suit and a gray bandana and another wore a red Coogie sweater. The men wanted Caesar's Rolex watch and he removed it. From a distance of 15 or 20 feet, he heard Wendell Rosiclair yell after he was hit with a gun. Caesar heard Rosiclair tell the gunman that he would cooperate with him. Rosiclair was yanking on the chain around his neck when he was shot by the gunman in the red Coogie sweater. After the

8

shooting, the men returned to the jeep and sped from the scene (Caesar: 241).

On August 17, 1999, Caesar viewed a line-up. Caesar selected the appellant from the line-up and placed the appellant at the scene. He could not, however, state what the appellant may have done that night or what he wore (Caesar: 244-50).

**NEGESTI CHUNG** was with the group on 35th Street when she saw three men at the corner (Chung: 325). Two of the men were armed. One of the armed men, the man closest to Chung, wore a light-colored hat and scarf. The other, she recalled, wore no mask (Chung: 328).Chung heard the perpetrators announce a robbery. The men removed took watches and jewelry. The gunman without a mask hit Rosiclair in the head with a gun. Rosiclair tugged at his chain and was shot at close range by the gunman (Chung: 332-34). After the shooting, the men entered the jeep and left the scene (Chung: 334-35). En route to the jeep, the shooter first walked and then ran (Chung: 335-36).

On August 17, 1999, Chung viewed a line-up. She thought that one person looked familiar from the charged incident but was not 100% certain (Chung: 339-41). Chung did not recall seeing any of the perpetrators at the Trinity club that evening (Chung: 342). Chung identified the scarf and mask worn by one of the gunmen. Over defense objections, Chung identified the appellant in court as the shooter (Chung: 344). On cross-examination, Chung admitted that she not state with 100% certainty that the appellant was the shooter (Chung: 345,47). In a statement to the police shortly after the crime, Chung had stated that it was the man with the mask who had hit and then shot Rosiclair (Chung: 348-49).

**SHANIQUE HARMON** had also celebrated Kevin Caesar's birthday on the relevant night and was on the scene during the charged crime (Harmon: 358-67). She recalled three perpetrators, one in a red Coogie sweater and another wearing a beige bandana over his face. Both the man with the

9

bandana and the man in the red sweater were armed. The person in the red Coogie sweater held a gun on Rosiclair and then shot him. The men then fled to the jeep and left the scene (Harmon: 368-73). Harmon did not get a good look at the man in the red sweater. She testified that the perpetrators were not men that she knew (Harmon: 376-77).

Shortly after the shooting, Police Officer **RASHIDA JUPITER** arrived at the scene in response to a radio report (Jupiter: 392-94).The officer summoned an ambulance and secured the crime scene. On April 4, 1999, officer Jupiter identified Rosiclair's body at the Office of the Medical Examiner (Jupiter: 394-98).

**ROBERT SCHMIDT**, a criminologist in the employ of the New York Police Department, testified that there gunpowder residue was found on the left sleeve of the decedent's leather jacket (Schmidt: 399-409).[4]

**Dr. BARBARA SAMPSON**, a medical examiner in the employ of the City of New York and an expert in forensic pathology, performed the autopsy upon the decedent (Sampson: 443-47). Dr. Sampson noted that Rosiclair's body showed a small laceration above the left eyebrow and a single gunshot wound to the arm and chest. She opined that the decedent's arm was bent when at the time of the entry of the bullet. The bullet traveled through the decedent's arm and into his chest. The doctor concluded that the cause of death was the gunshot wound with perforations of the heart, diaphragm and liver. The doctor opined that the wound to the head could have resulted from the decedent's being struck with a blunt instrument. The doctor further opined that the presence of

---

[4]Schmidt had initially been declared an expert in trace evidence and gunshot residue. After he provided confused testimony one the issue of the distance between the shooter and the decedent, the court revoked his expert status (Trial Transcript at 437). Accordingly, Schmidt's testimony with regard to that issue is not detailed herein

gunpowder residue generally means that there was less than three feet between the shooter and the target (Sampson: 448-457).

The prosecution's next witness was **JAMAL SONGUI** (Songui: 476-80). Songui was convicted of statutory rape and arrested on the night of the crime for trying to fight his way into the ambulance that arrived at the scene. Songui had been in the Trinity club with the decedent's group and had ingested two glasses of champagne there. Songui was urinating in an alley between two houses when he heard the announcement of a robbery (Songui: 488-90). Songui saw someone trying to yank Rosiclair's chain. He stated that the man wore a red Coogie sweater and a black stocking cap. Songui saw another man, as well. That man wore a brown hat and a brown scarf. At trial, Songui identified the scarf and hat (Songui: 509). Rosiclair was trying to remove his necklace when the man in the red Coogie sweater stepped back about fourteen to eighteen inches and shot him. Songui watched the incident from a distance of twelve to fifteen feet. The four perpetrators ran from the scene after the shooting. Songui chased them and then returned to Rosiclair. Songui claimed that he had seen the shooter in the club that night (Songui: 490-99). Indeed, Songui claimed to have seen the shooter four or five times (Songui: 503).

After the incident, Songui did not tell the police that he knew the shooter. He claimed that he "wanted to handle it myself" (Songui: 504). Songui alleged that he intended to murder the gunman and avenge Rosiclair's death. Over defense objections (501-02), and after the court had denied the defense an independent source hearing, Songui identified the appellant as the shooter (Songui: 509).

Detective **STEVEN FIORICA**, an expert in ballistics and firearm analysis, testified that the bullet hole of 1½ inches in the decedent's clothing and the evidence of gunpowder around the hole lead him to conclude that the shooter had stood within ten inches of the decedent (Fiorica: 550-60). Detective

11

Fiorica examined and weighed the bullet recovered from the decedent. Based upon the weight of the bullet, he concluded that the bullet was a .38 caliber bullet. The detective testified that 99.9% of guns which take .38 caliber bullets are revolvers (Fiorica: 562).

**REBECCA ETORIA** was another of the celebrants at the club. At the scene on 35th Street, she saw three men walking up the street (Etoria: 576-82). One man wore a red Coogie sweater, one man wore a beige hat and a bandana on his face and a third man wore a gray "Enyce" brand sweatsuit. She claimed to recognize the men from the club. At trial, Etoria identified the hat and bandana worn by the perpetrator dressed in beige (Etoria: 608). Etoria stated that any other clothing description that may have been attributed to her in a police report was an error by the police (Etoria: 628). Etoria alleged that the man in the red Coogie sweater had jumped a barricade to get into the club and had asked her to dance once inside the club. She stated that the man in the red Coogie sweater was armed with a gun (Etoria: 583-94). Rosiclair gripped the chain around his neck. And Etoria watched as the man in the red sweater grabbed and then shot Rosiclair. At trial, Etoria identified the appellant as the man in the red sweater. Etoria had selected the man in beige from a line-up on April 9, 1999. On August 17, 1999, Etoria selected the appellant from a lineup and identified him to the police as the shooter (Etoria: 595-628).

Detective **MICHAEL HINRICHS** testified that Shiloh Hylton was arrested on April 8, 1999 in the office of his parole officer (Hinrichs: 652). At the time of arrest, Hylton wore the hat and bandana identified by the prosecution witnesses at trial (Hinrichs: 654). Detective Hinrichs placed Hylton in a lineup which was viewed by Rebecca Etoria. Later that day, Hylton was arrested in connection with the charged crime (Hinrichs: 657). In August of 1999, the detective arrested the appellant in Rome, New York. That evening, the detective placed the appellant in a line-up that was viewed by witnesses

12

to the crime charged. In advance of the lineups, the appellant as interrogated by the detective and his partner Detective Hector (Hinrichs: 657-68).

The detectives provided the <u>Miranda</u> warnings to the appellant. The appellant refused to sign the <u>Miranda</u> card without consulting Omara Christian, the mother of his child. The detective read the appellant's statement into the record (Hinrichs: 675-76). The appellant refused to sign the statement until he consulted with Ms. Christian. At about 9:00 p.m., Ms. Christian arrived at the precinct. After conferring with her, the appellant declined to sign anything for the police. Over the appellant's objections, the detective was permitted to testify that the appellant allegedly stated, "If I sign something, you'll just go pick up Arthur and he'll come in and say that I was the one who shot him and we'll both do hard time." (Hinrichs: 679). *Over defense objections that the question impinged on the appellant's right to remain silent* (Trial Transcript at 707-15), the prosecution **three times** elicited from the detective that the appellant refused to make a statement on videotape or speak with the District Attorney's Office (Hinrichs: 715, 773, 775-77).

After the appellant was interrogated, Detective Hinrichs placed the appellant in a line-up. The line-up was viewed by Rebecca Etoria, Kevin Caesar, Rodney Francois and Niki Chung. The prosecution placed photographs of the line-up into evidence (Trial Transcript at 725). The detective did not know if the witnesses who viewed the line-up had seen the appellant's picture in the "Most Wanted" advertisement placed by the police in the Daily News (Hinrichs: 759).

On cross-examination, the detective admitted that the appellant did not possess a valid driver's license (Hinrichs: 754).

At the close of the detective's testimony, the parties stipulated that the appellant's date of birth was July 10, 1979 (Trial Transcript at 814).

LAMOUR CHRISTIAN authenticated a picture of the son that she had with the appellant (Christian: 816). Though the picture had been recovered from Shiloh Hylton at the time of his arrest, Christian testified that she did not know Hylton and did not know how he came to possess the photograph of her son (Christian: 822-23).

Detective MICHAEL DOHERTY testified that he had made in error in typing the handwritten notes that he had taken during a statement provided to him by Rebecca Etoria (Doherty: 860-866). The error caused him to attribute the face bandana to the wrong perpetrator (Doherty: 869, 877).

At the conclusion of Detective Doherty's testimony, the prosecution rested (Trial Transcript at 887).

The parties stipulated that at the time of death, Wendell Rosiclair was found to have a blood alcohol level of .11 and, further, that .10 is the level of intoxication for the purposes of the crime of Driving While Intoxicated (Trial Transcript at 888).

After the stipulation, the defense rested (Trial Transcript at 889).


The Verdict And Sentence

The jury convicted the appellant of first-degree murder and criminal possession of a weapon in the second degree. On June 27, 2000, the appellant appeared before the court for the sentence. Counsel reminded the court that the appellant was just 19 at the time of the charged crime. Counsel also expressed to the court his belief that the appellant "regretted most deeply what occurred on that evening." (Sentence Minutes at 10-11). The appellant then spoke himself. Though the appellant denied that he was the shooter, he pledged to assist the Office of the District Attorney in finding the shooter (Sentence Minutes at 11-12). The prosecution aknowledged that the appellant had been

forthcoming with information regarding "the several members of his group that night, who remain unapprenhended." (Sentence Minutes at 8). In closing, the appellant sent his "condolences for the family with most respect." (Sentence Minutes at 12).

In advance of sentence, the court itself aknowledged the troubling question of intent in this case. The court "**noted that the defendant, although one shot can take a life and one shot did take a life in this case, one of the issues is whether or not the defendant intentionally caused the death of Wendell Rosiclair. I am sure that's going to be an issue that's going to be raised on appeal.**" (Sentence Minutes at 16-17). Despite this acknowledgment of a key problem in the prosecution's proof, the court inexplicably sentenced the appellant to consecutive sentences. The appellant was sentenced to the following consecutive terms of imprisonment: an indeterminate term of 25 to life for the homicide, a definite term of 15 years for the weapon possession, an indeterminate term of 1⅓ to 4 years for one of the probation violations (Goldberg, J.). On the other probation violation, the appellant was sentenced to an indeterminate term of 5 to 15 years (Gerges, J.). The appellant's cumulative sentence is thus 46 ⅓ years to life (Goldberg, J.).

## ARGUMENT

### POINT I
THE APPELLANT'S CONVICTION MUST BE REVERSED AND THE INDICTMENT AGAINST HIM DISMISSED BECAUSE HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO COUNSEL WERE VIOLATED BY THE RUSE CRAFTED BY THE POLICE TO GAIN UNFETTERED ACCESS TO HIM FOR THE PURPOSES OF INTERROGATION AND, FURTHER, BECAUSE THE TRIAL USE OF THE STATEMENT GAINED THEREBY DIRECTLY CONTRIBUTED TO THE JURY'S VERDICT OF GUILT.

The simple and determinative truth of this case is that the release of the appellant in his own recognizance in Rome, New York was a ruse crafted by the police departments and prosecutorial agencies in that upstate area and Brooklyn to provide the Brooklyn officers with unfettered access to the appellant in connection with the instant homicide. This collusion meant that for all intents and purposes the appellant was never actually released from custody. While he remained in custody, the appellant could not be interrogated by the police on any subject, "whether related or unrelated" to the charge upon which he had counsel. People v. Steward, 88 N.Y. 2d 496, 501 (1996). *See also,* People v. Bing, 76 N.Y. 2d 331, 340 (1990 ) (once an accused has counsel the absence of a counseled waiver bars further custodial interrogation of a subject on any matter); People v. Rogers, 48 N.Y. 2d 167, 173 (1979) ("once an attorney has entered the proceeding, thereby signifying that the police should cease questioning, a defendant in custody may not be further interrogated in the absence of counsel"). Consequently, the interrogation of the appellant in the 67th Precinct and the trial use of the statement attributed to him violated the appellant's State and Federal Constitutional rights to counsel, due process and a fair trial.

The facts adduced at the pretrial hearing established the State and Federal constitutional violations in this case. The officer who arranged and conducted the transport of the appellant to Brooklyn,

Detective Hinrichs, admitted that at the time of transport it was his understanding that the appellant still had a pending case upstate (Hinrichs: H. 70). The detective was also aware that a bench warrant had been issued for the appellant in a Brooklyn case. The detective was aware that the appellant "was to be sentenced and he bench warranted on the case." (Hinrichs: H. 70). Despite this awareness, the detective still claimed that he did not believe that the appellant was represented by counsel in Brooklyn and, further, that he was "not sure" about counsel on the Rome case (Hinrichs: H. 71). This claim was patently ridiculous. **So, too, was the detective's further claim that the circumstances of the appellant's release in Rome was not formally arranged.**

With regard to the upstate "release," the detective alleged that "before we could make a decision on what actually to do, the deputy called up and said he was being released and we had to go up there." (Hinrichs: H. 73-74). The prosecution below alleged that the appellant was free to be questioned by the police as he had been released in his own recognizance in advance of his transport to Brooklyn for interrogation. Defense counsel noted that at the time of interrogation, the appellant had open cases both upstate and downstate and explained that: **"The release, such as it was to police custody, was designed to preclude my client's right to counsel. It was also designed to circumvent him having access to either of his two attorneys . . . "** (H. 125) (emphasis supplied). The court itself noted that there **"was testimony they conferred with the District Attorney's office in Kings County and the District Attorney's office in Rome, New York, so I assume that they were aware of the status of the cases and probably obtained advice from the District Attorney's office as to how to proceed."** This finding by the court established the constitutional violation in this case by finding collusion between the two prosecuting agencies. The entire purpose of the collusion was to defeat the appellant's right to counsel. The defense agreed with the court's

ruling and highlighted the logical conclusion of the court's findings. The defense properly noted that in view of the hand-in-glove relationship between the prosecuting agencies, "what we can safely conclude, this was a design, either orchestrated by the Brooklyn District Attorney's office in cahoots with the 67[th] Precinct, or this was something of their own device to circumvent my client's right to counsel." (H. 126).

In response, the prosecution relied on People v. Bing, 67 N.Y. 2d 331 (1990), and argued that a "defendant who is not in custody in the pending case may be questioned in the absence of his attorney on an unrelated matter." (H. 130-31). The prosecution's argument, however, ignored the chicanery by the police and the law enforcement agencies that resulted in the sham release of the appellant from custody. The detective denied any such premeditation. The court's comments, however, established that the court itself rejected the notion that the appellant's timely release from custody in Rome, New York was pure serendipity. Based upon all of these factors, the hearing court's determination that the appellant was not in custody at the time of interrogation represents a misapplication of the law. The appellant was indeed in custody and he was represented by counsel on another case. As such, the appellant could not be interrogated by the police on any subject, "whether related or unrelated" to the charge upon which he had counsel. People v. Steward, 88 N.Y. 2d 496, 501 (1996). *See also*, People v. Bing, 76 N.Y. 2d 331, 340 (1990 ) (once an accused has counsel the absence of a counseled waiver bars further custodial interrogation of a subject on *any* matter); People v. Rogers, 48 N.Y. 2d 167, 173 (1979) ("once an attorney has entered the proceeding, thereby signifying that the police should cease questioning, a defendant in custody may not be further interrogated in the absence of counsel").

The interrogation of the appellant offended State and Federal Constitution provisions regarding the right to counsel because the devious actions of the police failed to circumvent the controlling case

in this area, the <u>Burdo</u> case. The <u>Burdo</u> holding, that a suspect in custody and represented by counsel cannot be questioned, even on an unrelated matter, in the absence of a waiver exercised in the presence of counsel, <u>People v. Burdo</u>, 91 N.Y. 2d 146, 149 (1997), should have resulted in the suppression of the statement attributed to the appellant by the police. As the result of the sham release crafted between the two police departments, the appellant never left police custody. The appellant remained in police custody during the entire relevant period and was represented by counsel at the time that he was questioned. The prosecution successfully convinced the hearing court that the appellant was no longer in upstate custody at the time of interrogation (and therefore, not in custody at all for right to counsel purposes). Under the facts of this case, though, it *was* police custody. The entire notion that the appellant was released in his own recognizance was patently ridiculous. **At the time of the alleged release, the appellant had already been identified by witnesses as the perpetrator in a homicide. Under these circumstances no police department would have released him in his own recognizance.** It was no surprise or coincidence that the Brooklyn police arrived to collect the appellant for questioning before he set a foot outside of the upstate facility where he had been held.

Despite the cogent, compelling and ultimately correct arguments by the defense, the hearing court denied the appellant's suppression motion. In a decision issued from the bench, the court found that the "law allows the police to waive the defendant's right to counsel attaches [sic] if there is independent cause to arrest on another charge. " (H. 133). The flaw in the court's reasoning was that the Brooklyn arrest was a new arrest: the appellant remained in custody the entire time. **That the appellant never left police custody was blatantly obvious from the manner in which he was transported. The appellant was brought to Brooklyn in handcuffs and leg irons** (Hinrichs: H 75). In manipulating the Rome police department in this manner, the police rendered the Rome

19

prosecuting agencies a subsidiary agency of the downstate police department. The thus never lef

police custody and could not have been questioned in the absence of a waiver exercised in he presenc

of counsel.

This case in analogous to cases in which police departments have sought unsuccessfully to use th

parole department to perform those tasks which the police may not constitutionally perforn

themselves People v. Mackie, 77 A.D. 2d 778 (4th Dep't. 1980) (parole officers improperly acted a

a "conduit" for police in function police otherwise could not lawfully perform"); People v. Candelaria

63 A.D. 2d 85, 90 (1st Dep't. 1978) (parole officers held to have acted as agents of police, thereby

enabling police to circumvent constitutional requirements"). The relationship between the upstate and

downstate police this case established that, in fact, the upstate police acted as a conduit for the polic

and that the appellant release in his own recognizance was merely "a pretext for arrest on homicid

charges." People v. Dyla, 142 A.D. 2d 423 (2d Dep't. 1988).

Based upon all of these factors, the hearing court's determination that the appellant wa

released in his own recognizance in advance of interrogation represents a misapplication of the law

The appellant remained in police custody because the upstate police acted as a conduit for th

downstate police. The combined effort of the two police departments was a crude attempt t

circumvent the appellant's right to counsel. Therefore, this Court is urged to rule that the statemen

attributed to the appellant should have been suppressed. The error in permitting this inculpator

statement to be placed before the jury cannot be deemed harmless beyond a reasonable doubt. People

v. Crimmins, 36 N.Y. 2d 230, 237 (1975). The statement placed the appellant at the scene and

suggested that the appellant was at a minimum aware in advance of the robbery plot that ultimately

went awry. Moreover, to the extent that this statement may have been used in the prosecution's grand

20

jury presentation, the indictment against the appellant should be dismissed in its entirety.

In sum, identification was a key issue in this case. In view of the centrality of the question o
identity, the trial use of the statement attributed to the appellant, a statement in which he allegedl
placed himself at the scene and aknowledged awareness in advance of the robbery to be perpetrated
directly contributed to the resultant verdict of guilt. As the Supreme Court has recognized,
confession is like no other evidence in that it has a profound impact upon the finders of fact. Arizon
v. Fulminante, 499 U.S. 279,296 (1991). For these reasons, the trial use of these ill-gotten statemen
cannot be deemed harmless error and reversal is fully warranted in this case.

POINT II
THE APPELLANT'S CONVICTION MUST BE REVERSED BECAUSE THE
PROSECUTION IMPERMISSIBLY ELICITED THE FACTS OF THE APPELLANT'S
INVOCATION OF HIS RIGHT TO REMAIN SILENT AND, FURTHER, BECAUSE THE
TRIAL USE OF THE APPELLANT'S INVOCATION OF HIS RIGHT TO REMAIN SILENT
DIRECTLY CONTRIBUTED TO THE JURY'S VERDICT OF GUILT.

At trial, over the appellant's objections, Detective Hinrichs, the investigating detective in this case
was permitted to three times testify that the appellant, after providing the police with an ora
statement, refused to provide the police with a statement on videotape and refused to speak with a
representative from the District Attorney's Office (Hinrichs: 715, 773, 775-77). These portions o
testimony were not followed by any curative instructions. Under the circumstances of this case, this
improper use of the appellant's invocation of his right to silence warrants the reversal of the resultant
conviction.

An indication by a subject in custody that he wants to cut off further inquiry is an invocation o
his State and Federal right to remain silent. U.S. Const. 5,[th] 14th Amends.; N.Y. Const., art. I §6

21

People v. Hendricks, 90 N.Y. 2d 956, 957 (1997); People v. Von Werne, 41 N.Y. 2d 584, 587-88

(1976). Receipt of testimony regarding the invocation the right to silence is "clear error," as it serves

no purpose other than to permit the jury to infer "consciousness of guilt." 41 N.Y. 2d at 587-88. "The

protections which the Constitution affords to a person charged with a crime apply in full measure, to

all criminal defendants . . . to allow his insistence upon his constitutional rights to be used against him,

would seriously impair the value of those protections. People v. Al-Kanani, 26 N.Y. 2d 473, 478

(1970).

    Reversal is mandated in cases such as this one, where the prosecution adduces testimony regarding

the invocation of the right to remain silent, unless it can be said that the error was harmless beyond

a reasonable doubt. People v. Basora, 75 N.Y.2d 992, 994 (1990); People v. Diggs, 185 A.D. 2d 990

(2d Dep't. 1992). **Here, where the offending testimony was in the absence of curative**

**instructions placed before the jury three times and was never struck from the record, there**

**exists the very real "reasonable possibility" that the error contributed to the jury's ultimate**

**determination of guilt.** People v. Diggs, 185 A.D. 2d at 990 (reversal warranted even where

offending testimony was struck from the record and curative instructions were delivered immediately).

    In sum, the silence of an accused may not be used against him by the prosecution. Griffin v.

California, 380 U.S. 609, 615 (1965). In this case, the defense fully preserved its objections to the

offending testimony of Detective Hinrichs. Over those objections, the detective testified that after

providing the police with an oral statement, the appellant declined to be interrogated on video or by

an individual in the employ of the Kings County District Attorney. In view of the incendiary nature

of this testimony, it cannot be said that the errors related to its repeated trial use were harmless beyond

a reasonable doubt. Accordingly, reversal is fully warranted. People v. Crimmins, 36 N.Y. 230, 237

22

(1975); <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967).

<u>POINT III</u>

<u>THE APPELLANT'S CONVICTION MUST BE REVERSED BECAUSE THE
PROSECUTION FAILED TO DEMONSTRATE THAT THERE EXISTED AN
INDEPENDENT SOURCE FOR THE IDENTIFICATIONS OF THE APPELLANT BY
PROSECUTION WITNESSES NEGESTI CHUNG AND JAMAL SONGUI. IN THE
ALTERNATIVE, THIS COURT IS URGED TO HOLD THIS APPEAL IN ABEYANCE AND
REMAND THE CASE FOR AN INDEPENDENT SOURCE HEARING.</u>

At trial, two prosecution witnesses, Negesti Chung and Jamal Songui, identified the appellant as

the perpetrator for the first time. Songui was not contacted by the police to view a line-up conducted

several months after the charged incident. On the date of the charged incident, Songui stated that he

was unable to see the gunman. Chung viewed the line-up but could not with certainty select the

gunman from the array of men on view before her. Each of them, without a prior hearing on the issue

of independent source, identified the appellant as the perpetrator. These identifications directly

contributed to the jury's verdict of guilt and so violated the appellant's State and Federal constitutional

rights to a fair trial. Accordingly, this Court is urged to reverse the jury's finding of guilt or, in the

alternative, hold this appeal in abeyance and remand this case for an independent source hearing.

The testimony of Chung and Songui established that neither had officially identified the appellant

as the shooter in advance of trial. Chung had viewed the lineup but been unable to make an

identification. Chung thought that one person looked familiar from the charged incident but was not

100% certain (Chung: 339-41). Over defense objections, Chung identified the appellant in court as the

shooter (Chung: 344). On cross-examination, Chung admitted that she not state with 100% certainty

23

that the appellant was the shooter (Chung: 345,47). Songui never participated in a pretrial

identification procedure. Songui told the police on the date of the charged crime that he had been

unable to view the gunman during the incident. At trial, Songui alleged that his earlier statement was

a lie. He alleged that he did not tell the police that he knew the shooter because he "wanted to handle

it myself" and avenge Rosiclair's death (Songui: 504). Over defense objections (501-02), and after the

court had denied the defense an independent source hearing, Songui identified the appellant as the

shooter (Songui: 509). Each of these identifications was made under highly suggestive conditions and,

thus, independently and cumulatively, deprived the appellant of due process and a fair trial.

A conviction must be reversed if a particular identification procedure was "so impermissibly

suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Haberstrob

v. Montanye, 493 F. 2d 483, 484 (2d Cir. 1974), quoting, Simmons v. United States, 390 U.S. 377,

384 (1968). The viewing of the appellant at counsel table was just such an impermissibly suggestive

procedure. "[S]everal courts have noted the problems inherent in a criminal defendant's being seated

in a manner that plainly identifies him as the suspect when the reliability of a witness's identification

is at issue." Jarrett v. Headley, 633 F. Supp 1403, 1417 (S.D.N.Y. 1986); See also, People v. Moger

85 A.D. 2d 610 (2d Dep't. 1981). Following such a suggestive identification procedure, the

prosecution may not adduce evidence of in-court identifications witnesses unless it establishes "by

clear and convincing evidence that the in-court identifications were based upon observation of the

suspect" upon an occasion other than the suggestive procedure. United States v. Wade, 388 U.S. 218,

240 (1967). For reasons particular to each of these two individual witnesses, the prosecution failed

below to meet its burden of proof with regard to independent source.

The facts and circumstances of the case establish that the prosecution could never have established

24

independent source with regard to Chung. Chung had been unable to identify the appellant as the shooter at the line-up conducted just four months after the crime. Over a year later she certainly would not have been able to do so unless she had seen the appellant isolated at the defense table. Moreover, there is evidence in the record that Chung misled the jury (and may have misled herself) with regard to her ability to view the gunman during the incident. At trial, Chung testified that the gunman had not worn a bandana at the time of the incident. In a statement to the police shortly after the crime, however, Chung had stated, presumably inaccurately, that it was the man with the mask who had hit and then shot the decedent (Chung: 348-49). Moreover, while the prosecution alleged that the appellant and his cohorts were at the same dance club as Chung and her friends in the hours prior to the incident, Chung did not recall seeing them there. Under these circumstances, the prosecution did not and could not establish that Chung's identification of the appellant at trial was based upon a source independent of her observation of the appellant at trial. United States v. Wade, 388 U.S. 218, 240 (1967); People v. Ballot, 20 N.Y. 2d 600, 606-07 (1967). Accordingly, the court erred in overruling the defense objection to Chung's in-court identification of the appellant.

The record also fails to establish an independent source for Songui's identification of the appellant. To begin with, it must be noted that there was ample reason to question Songui's claim that he had seen the appellant perpetrate the crime charged. Songui was convicted of statutory rape and was arrested on the night of the crime for trying to fight his way into the ambulance. Further troubling, he alleged that his earlier statement to the police that he had not seen the shooter was a lie designed to cover his plan to personally avenge his friend's death. In addition, Songui may have been impaired at the time of the incident: he admitted to having ingested two glasses of champagne at the Trinity Club. Moreover, the circumstances under which Songui witnessed any of the events at issue that he was

actually able to see were less than ideal. Songui was urinating in an alley between two houses when he heard the announcement of a robbery and watched the incident from a distance of twelve to fifteen feet. Under all these circumstances, Songui claims that he had seen the shooter in the club that night and on four or five prior occasions were inherently suspect. The subtext of Songui's testimony was clear: his best friend was murdered and he would do or say anything to achieve vengeance.

The court below erred in failing to grant the appellant the independent source hearing requested by the defense in advance of the in-court identifications of the appellant by Chung and Songui. With regard to preservation, the court's comments denying the defense an independent source hearing during Songui's testimony establish that such a hearing had been requested and denied in advance of Chung's and Songui's identifications of the appellant (Trial Transcript at 501-09). The viewing of the appellant in court by these witnesses created the substantial likelihood of misidentification and their identification of him deprived him of the fair trial with the reliable result that is the hallmark of due process. For these reasons, this Court is urged to reverse the jury's verdict of guilt or, in the alternative, hold this appeal in abeyance and remand this case for an independent source hearing.

**THIS COURT IS URGED TO REVERSE THE APPELLANT'S HOMICIDE CONVICTION BECAUSE THE PROSECUTION FAILED TO PROVE INTENT BEYOND A REASONABLE DOUBT. IN ANY EVENT, THE JURY'S VERDICT OF GUILT WITH REGARD TO THE CHARGE OF FIRST-DEGREE MURDER WAS AGAINST THE WEIGHT OF THE EVIDENCE.**

The court erred when it denied the defense motion for a trial order of dismissal with regard to the homicide charge (Trial Transcript at 890) because the prosecution failed to prove intent beyond a reasonable doubt. The prosecution failed to prove both that the shooter fired intentionally and that when he fired he did so with the intent to kill. While the defense admittedly did not present the instant claim with specifity to the trial court, that claim is squarely and properly before this Court. The deprivation of a fundamental constitutional right is within the jurisdiction of an appellate court as a matter of law because such ready access is necessary, "to ensure that criminal trials are conducted in accordance with the mode of procedure mandated by Constitution and Statute." People v. Patterson 39 N.Y. 2d 288, 295 (1976).The reasonable doubt standard, a key component of due process, has been described as, "the prime instrument for reducing the risk of conviction resting on factual error," In re Winship, 391 U.S. 144, 145 (1968), and is written into this State's criminal procedure statute, C.P.L .§70.20 ("No conviction of an offense by verdict is valid unless based on trial evidence which is legally sufficient and which establishes beyond a reasonable doubt every element of such offense and the defendant's commission thereof."). In proper deference to this fundamental constitutional right, the instant claim is before this Court as a matter of law without regard to the absence of a specific reference to that claim in counsel's motion for a trial order of dismissal.

The entrance location of the single bullet fired militated against a finding of an intent to kill. The shooter shot the decedent in the arm. At that moment, the shooter could not have anticipated that the

bullet would travel through the decedent's body and perforate vital organs. Even if the shooter fired intentionally, it was with an intent to scare or wound. A gunman does not inflict a wound to another's arm with an intent to kill. The prosecution's witnesses established that the gunman and the decedent stood close together during the charged incident. Had the gunman sought to kill the decedent, he could have easily fired a single gunshot wound to the decedent's head. Indeed, moments before the shot rang out, the shooter had hit the decedent in the head with the gun. That action demonstrated escalating tension but not homicidal intent. Even if one were to fully credit the testimony of each prosecution witness, the record is still without any proof that the shooter fired with the intent to kill.

To find the appellant guilty of the charged crime of first-degree murder, the jury had to find that there existed proof beyond a reasonable doubt that the appellant fired "with the intent to cause the death of another person." P.L. §125.27(1) (vii). Such evidence to be sufficient must be said to have "excluded every reasonable hypothesis" other than the intent to commit homicide. People v. Allah, 71 N.Y. 2d 830, 832 (1988). In evaluating a claim of this nature on appeal, the evidence must admittedly be viewed in the light most favorable to the People. People v. Marin, 65 N.Y. 2d 741 (1985); People v. Contes, 60 N.Y. 2d 620 (1983). Even in the light most favorable to the prosecution, however, the proof adduced at trial did not meet the burden of proof beyond a reasonable doubt.

The trial court itself recognized the instant issue. In advance of sentence, the court aknowledged the troubling question of intent in this case. The court "noted that the defendant, although one shot can take a life and one shot did take a life in this case, one of the issues is whether or not the defendant intentionally caused the death of Wendell Rosiclair. I am sure that's going to be an issue that's going to be raised on appeal." (Sentence Minutes at 16-17). Simply stated, even if one accepts the whole of the proof adduced by the prosecution at trial - - its entire case - - the hypothesis that the shooter

fired with the intent to kill does not exclude every other reasonable hypothesis.

This case presented a robbery gone awry not a case of intentional murder. The prosecution failed to establish that the shooter fired intentionally or that, even if there was an intent to fire, that the intent at that moment was to cause the death of another. The testimony of prosecution witness Negest Chung provided insight into the surprise of the shooter. After the shooting, the perpetrators entered the jeep and left the scene (Chung: 334-35). En route to the jeep, the shooter first walked and then ran (Chung: 335-36). This hesitance bespeaks the surprise and shock of the shooter at the unintended consequence of a street robbery. While it is indeed true that one who perpetrates an armed robbery should anticipate that a violent result may ensue, that logic does not fulfill the prosecution's obligation to prove reasonable doubt with regard to intent to cause death. On this record there is simply no proof that the shooter shot intentionally or shot to kill.

In sum, this Court is urged to review this claim both because it is properly before it as a matter of State and Federal constitutional law and also in the interest of justice. ***The whole of this record does not establish an intent to kill.*** The jury's verdict of guilt with regard to the crime of intentional murder cannot and should not withstand this Court's constitutional scrutiny. Furthermore, if this Court somehow concludes that the prosecution made out a legally sufficient case at trial, it is still urged to vacate the appellant's first-degree murder conviction in recognition that the verdict of guilt with regard to that charge was against the weight of the evidence. See, C.P.L. §470.15(5).

## THE APPELLANT'S SENTENCE IS ILLEGAL AND UNCONSTITUTIONALLY HARSH AND EXCESSIVE

This Court is urged to adjust the appellant's sentence so that the terms of imprisonment are all ru[n]

concurrently. As a matter of law, the sentences for the homicide and weapon possession should ru[n]

concurrently. The weapon used in the furtherance of the robbery that was charged as an element o[f]

the homicide and the crime of second-degree weapon possession emanated from the same acts. Peopl[e]

v. Catone, 65 N.Y. 2d 1003 (1985) (convictions for leaving the scene and vehicular manslaughter wer[e]

based in the same acts and so mandated concurrent sentences). The gun used in furtherance of th[e]

robbery was the murder weapon. The element of weapons possession which "in itself constituted on[e]

of the offenses" was thus also under the circumstances of this case "a material element of the other."

P. L. §70.25(2); People v. Laureano, 87 N.Y. 2d 640 (1996) (concurrent sentences mandated wher[e]

"the People have advanced no facts supporting the view that the . . . serious physical injury wa[s]

caused by an act other than a homicidal act"). Accordingly, the court erred when it failed to run thos[e]

particular sentences concurrently. Also, as a matter of discretion and in the interest of justice, thi[s]

Court is urged to modified the sentenced pronounced such that all of the sentences are ru[n]

concurrently.

The consecutive terms on the top counts violated the relevant sentencing statute. The appellan[t]

was charged with first-degree murder pursuant to P.L. §125.27(1)(a)(vii) and the felony charge[d]

pursuant to section (vii) was third-degree robbery.[5] The prosecution's own allegations and witnesse[s]

established that the particular crime that was well-underway at the time of the homicide was a first[-]

---

[5] A copy of the indictment is appended to this brief.

degree robbery. ***Though in theory a weapon is not an integral element of third-degree robbery***
***the prosecution violated all notions of fair play and State and Federal Constitutional notions o***
***due process when it exposes an accused to a consecutive sentencing scheme by undercharging o***
***underestimating the underlying felony***.

The brevity of the charged incident and the split-second manner in which the decedent was sho
render it impossible to distinguish between the homicide, the robbery that underlay the charge of first
degree murder and the charge of second-degree weapon possession. In this case, there existed no
separation between the charged crimes but rather an undifferentiated chain of acts by which the
decedent was robbed and ultimately killed. This undifferentiated chain mandated concurrent sentences
In defending a consecutive sentence, the burden is upon the prosecution to demonstrate that the act
and omissions by the accused were separate and distinct acts. People v. Laureno, 87 N.Y. 2d at 644
Under the facts of this case, the prosecution did not and cannot meet this burden and it cannot evade
the proscription against consecutive sentences in this case by artificially "charging down" the
underlying felony from a first-degree robbery to a third-degree robbery.

Even if this Court were to conclude that the appellant's sentence is legal, it is still urged to modify
his sentence as a matter of discretion in the interest of justice by providing that all the terms o
imprisonment, or at least the homicide and weapons charges, be run concurrently with each other. In
analogous situations, various courts have recognized that the minimum sentence of over 46 years is
simply too onerous and harsh for the admittedly grievous but ultimately immature and unknowing act
of a 19-year old accused. People v. Noezile, 282 A.D. 2d 762 (2d Dep't. 2001); People v. Davis, 267
A.D. 2d 476 (2d Dep't. 597 (3d Dep't. 1999); People v. Fernandez, 261 A.D. 2d 178 (1st Dep't
1999). The facts of this case warrant such a reduction.

31

As discussed herein in Point IV, the court itself noted at the time of sentence that the question of intent was a real question in this case. The decedent was shot in the arm. The arm is not a location where a shooter aiming to commit murder would lodge a bullet. The prosecution's witnesses alleged that the gunman and the decedent stood in close proximity to each other. A shooter standing in such close proximity to his target could have easily assured a rapid demise by shooting the victim in a more vulnerable or critical portion of the anatomy. Under the facts of this case, where all factors suggested that the gunman acted with impatient and reckless immaturity, the sentences pronounced, at least those sentences on the homicide and weapons possession, should have been run concurrent to each other.

In sum, because the act of weapon-possession was an element of the underlying robbery that formed a portion of the first-degree murder charge and also an element of the second-degree weapon possession, and, further, because the record bears out that the reality that the charged homicide was more an act of nervous haste than one of premeditation, this Court is urged, as a matter of law and also as a matter of discretion and in the interest of justice, to substitute a concurrent sentencing scheme in this case.

# INDICTMENT

## SUPREME COURT OF THE STATE OF NEW YORK

### COUNTY OF KINGS

---

THE PEOPLE OF THE STATE OF NEW YORK

AGAINST

XJ.   LONNIE L TILLERY — AFO,VFO
      DEFENDANT
      99K060262

INDICTMENT NO. 6791/99
NON-ALIGNED
HOMICIDE

COUNTS

MURDER IN THE FIRST DEGREE ✓
MURDER IN THE SECOND DEGREE (2 COUNTS) ✓
ROBBERY IN THE FIRST DEGREE (2 COUNTS) ✓
ROBBERY IN THE SECOND DEGREE ✓
CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE ✓
CRIMINAL POSSESSION OF A WEAPON IN THE THIRD DEGREE
CRIMINAL POSSESSION OF A WEAPON IN THE FOURTH DEGREE

SUPREME COURT
KINGS COUNTY
CRIMINAL TERM
99 SEP 15 PM 6:36

KINGS COUNTY
GRAND JURY
WARDEN'S OFFICE
Sep 15  3 06 PM '99

TRUE BILL

FOREPERSON

CHARLES J. HYNES
DISTRICT ATTORNEY

A.1

## FIRST COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF MURDER IN THE FIRST DEGREE[ P.L. 125.27-1A(VII)] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT APRIL 4, 1999, IN THE COUNTY OF KINGS, BEING MORE THAN EIGHTEEN YEARS OLD AT THE TIME OF THE COMMISSION OF THE CRIME, WITH INTENT TO CAUSE THE DEATH OF WENDELL ROSICLAIR, CAUSED THE DEATH OF WENDELL ROSICLAIR BY SHOOTING HIM, IN THAT THE DEFENDANT AIMED AND FIRED A HANDGUN AT WENDELL ROSICLAIR, THEREBY INFLICTING VARIOUS WOUNDS AND INJURIES UPON WENDELL ROSICLAIR, AND THEREAFTER AND ON OR ABOUT APRIL 4, 1999, WENDELL ROSICLAIR DIED OF THE WOUNDS AND INJURIES; AND WENDELL ROSICLAIR WAS KILLED WHILE THE DEFENDANT, ACTING IN CONCERT WITH OTHER PERSONS, WAS IN THE COURSE OF COMMITTING THE CRIME OF ROBBERY IN THE THIRD DEGREE AND IN THE COURSE OF AND IN FURTHERANCE OF IMMEDIATE FLIGHT THEREFROM, TO WIT, THE DEFENDANT AND OTHER PERSONS FORCIBLY STOLE CERTAIN PROPERTY, NAMELY: A QUANTITY OF UNITED STATES CURRENCY AND JEWELRY FROM WENDELL ROSICLAIR; AND WENDELL ROSICLAIR WAS NOT A PARTICIPANT IN THE CRIME.

A. 2

## SECOND COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF MURDER IN THE SECOND DEGREE [P.L. 125.25-1] COMMITTED AS FOLLOWS:

THE DEFENDANT, ACTING IN CONCERT WITH OTHER PERSONS, ON OR ABOUT APRIL 4, 1999, IN THE COUNTY OF KINGS, WITH INTENT TO CAUSE THE DEATH OF WENDELL ROSICLAIR, CAUSED THE DEATH OF WENDELL ROSICLAIR BY SHOOTING HIM WITH A DEADLY WEAPON, NAMELY: A HANDGUN, THEREBY INFLICTING VARIOUS WOUNDS AND INJURIES UPON WENDELL ROSICLAIR, AND THEREAFTER AND ON OR ABOUT APRIL 4, 1999, WENDELL ROSICLAIR DIED OF THE WOUNDS AND INJURIES.

## THIRD COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF MURDER IN THE SECOND DEGREE [P.L. 125.25-3] COMMITTED AS FOLLOWS:

THE DEFENDANT, ACTING IN CONCERT WITH OTHER PERSONS, ON OR ABOUT APRIL 4, 1999, IN THE COUNTY OF KINGS, HAVING COMMITTED THE CRIME OF ROBBERY, AND IN THE COURSE OF AND IN FURTHERANCE OF SUCH CRIME AND OF IMMEDIATE FLIGHT THEREFROM, CAUSED THE DEATH OF WENDELL ROSICLAIR HE BEING OTHER THAN A PARTICIPANT, BY SHOOTING HIM WITH A DEADLY WEAPON NAMELY: A HANDGUN, THEREBY INFLICTING VARIOUS WOUNDS AND INJURIES UPON WENDELL ROSICLAIR, AND THEREAFTER AND ON OR ABOUT APRIL 4, 1999, WENDELL ROSICLAIR DIED OF THE WOUNDS AND INJURIES.

## FOURTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF ROBBERY IN THE FIRST DEGREE [P.L. 160.15-2] COMMITTED AS FOLLOWS:

THE DEFENDANT, ACTING IN CONCERT WITH OTHER PERSONS, ON OR ABOUT APRIL 4, 1999, IN THE COUNTY OF KINGS, FORCIBLY STOLE CERTAIN PROPERTY, NAMELY: A QUANTITY OF UNITED STATES CURRENCY AND JEWELRY FROM WENDELL ROSICLAIR, AND IN THE COURSE OF THE COMMISSION OF THE CRIME AND OF IMMEDIATE FLIGHT THEREFROM, THE DEFENDANT AND OTHERS WERE ARMED WITH A DEADLY WEAPON, NAMELY: A HANDGUN.

THE SUBJECT MATTER OF THIS COUNT BEING AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

## FIFTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF ROBBERY IN THE FIRST DEGREE [P.L. 160.15-1] COMMITTED AS FOLLOWS:

THE DEFENDANT, ACTING IN CONCERT WITH OTHER PERSONS, ON OR ABOUT APRIL 4, 1999, IN THE COUNTY OF KINGS, FORCIBLY STOLE CERTAIN PROPERTY, NAMELY: A QUANTITY OF UNITED STATES CURRENCY AND JEWELRY FROM WENDELL ROSICLAIR, AND IN THE COURSE OF THE COMMISSION OF THE CRIME AND OF IMMEDIATE FLIGHT THEREFROM, THE DEFENDANT AND OTHERS CAUSED SERIOUS PHYSICAL INJURY TO WENDELL ROSICLAIR WHO WAS NOT A PARTICIPANT IN THE CRIME.

SIXTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS
INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF ROBBERY IN THE
SECOND DEGREE [P.L. 160.10-1] COMMITTED AS FOLLOWS:

THE DEFENDANT, AIDED BY OTHER PERSONS ACTUALLY PRESENT,
ON OR ABOUT APRIL 4, 1999, IN THE COUNTY OF KINGS, FORCIBLY
STOLE CERTAIN PROPERTY, NAMELY: A QUANTITY OF UNITED STATES
CURRENCY AND JEWELRY FROM WENDELL ROSICLAIR.

SEVENTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS
INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF CRIMINAL
POSSESSION OF A WEAPON IN THE SECOND DEGREE [P.L. 265.03-2]
COMMITTED AS FOLLOWS:

THE DEFENDANT, ACTING IN CONCERT WITH OTHER PERSONS,
ON OR ABOUT APRIL 4, 1999, IN THE COUNTY OF KINGS, KNOWINGLY AND
UNLAWFULLY POSSESSED A LOADED FIREARM, NAMELY: A HANDGUN, WITH
INTENT TO USE UNLAWFULLY AGAINST ANOTHER.

THE SUBJECT MATTER OF THIS COUNT BEING AN ARMED FELONY
AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE
LAW.

A.5

## EIGHTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS
INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF CRIMINAL
POSSESSION OF A WEAPON IN THE THIRD DEGREE[ P.L. 265.02-4]
COMMITTED AS FOLLOWS:

THE DEFENDANT, ACTING IN CONCERT WITH OTHER PERSONS,
ON OR ABOUT APRIL 4, 1999, IN THE COUNTY OF KINGS, KNOWINGLY AND
UNLAWFULLY POSSESSED A LOADED FIREARM, NAMELY: A HANDGUN, SUCH
POSSESSION NOT BEING IN THE DEFENDANT'S HOME OR PLACE OF
BUSINESS.

THE SUBJECT MATTER OF THIS COUNT BEING AN ARMED FELONY
AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE
LAW.

## NINTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS
INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF CRIMINAL
POSSESSION OF A WEAPON IN THE FOURTH DEGREE [P.L. 265.01-1]
COMMITTED AS FOLLOWS:

THE DEFENDANT, ACTING IN CONCERT WITH OTHER PERSONS,
ON OR ABOUT APRIL 4, 1999, IN THE COUNTY OF KINGS, KNOWINGLY AND
UNLAWFULLY POSSESSED A FIREARM, NAMELY: A HANDGUN.

CHARLES J. HYNES
DISTRICT ATTORNEY

A.6