To be argued by:
SOLOMON NEUBORT
(10 Minutes)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:    SECOND DEPARTMENT

CV04-317
(ARW)

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

LONNIE TILLERY,

Defendant-Appellant.

Appellate Division
Docket Number
00-06289

Kings County
Indictment Number
6791/99

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★    OCT 1 8 2004   ★

BROOKLYN OFFICE

RESPONDENT'S BRIEF

LEONARD JOBLOVE
SOLOMON NEUBORT
Assistant District Attorneys
      of Counsel

September 17, 2002

CHARLES J. HYNES
DISTRICT ATTORNEY KINGS COUNTY
RENAISSANCE PLAZA
350 JAY STREET
BROOKLYN, NEW YORK 11201-2908
(718) 250-2000

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................... 1

STATEMENT OF FACTS .............................................. 3
    Introduction ............................................... 3
    The Wade/Huntley/Dunaway Hearing ........................... 4
        The People's Case ...................................... 4
        The Defense Case ....................................... 7
    The Arguments of Counsel and the Court's Decision .......... 7
    The Trial .................................................. 9
        The People's Case ...................................... 9
        Defendant's Case ...................................... 24
    The Verdict and the Sentence .............................. 24

POINT I -

THE HEARING COURT PROPERLY DETERMINED THAT DEFENDANT
HAD NOT BEEN IN CUSTODY ON AN UNRELATED CASE WHEN HE
MADE HIS STATEMENT TO THE POLICE AND THAT THEREFORE
PRESENCE OF COUNSEL HAD NOT BEEN NECESSARY FOR
DEFENDANT TO HAVE WAIVED HIS <u>MIRANDA</u> RIGHTS IN THIS
CASE ...................................................... 26

POINT II -

DEFENDANT'S CLAIM THAT HE WAS DENIED A FAIR TRIAL
BECAUSE THE PROSECUTOR ELICITED THAT DEFENDANT DECLINED
TO MAKE A VIDEOTAPED STATEMENT IS MERITLESS.   IN ANY
EVENT IN LIGHT OF THE COURT'S LIMITING INSTRUCTION TO
THE JURY REGARDING THAT EVIDENCE AND THE OVERWHELMING
EVIDENCE OF DEFENDANT'S GUILT IN THIS CASE, ANY ERROR
IN THE ADMISSION OF THAT FACT WAS HARMLESS BEYOND A
REASONABLE DOUBT ........................................ 32

POINT III -

DEFENDANT'S CLAIM THAT THE COURT ERRED IN PERMITTING
MS. CHUNG AND MR. SONGUI TO IDENTIFY DEFENDANT IN COURT
WITHOUT FIRST SUBJECTING THEM TO ANY PRIOR
IDENTIFICATION PROCEDURES IS PARTIALLY UNSUPPORTED BY
THE RECORD AND ENTIRELY MERITLESS.   IN ANY EVENT, IN
LIGHT OF THE OVERWHELMING EVIDENCE OF DEFENDANT'S GUILT
IN THIS CASE, ANY ERROR IN THE COURT'S RULING WAS
HARMLESS ................................................ 37

TABLE OF CONTENTS (cont'd)

POINT IV -

    DEFENDANT FAILED TO PRESERVE HIS LEGAL SUFFICIENCY CLAIMS. IN ANY EVENT, THE PEOPLE PROVED DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT .......................... 41

POINT V -

    THE IMPOSITION OF CONSECUTIVE SENTENCES WAS PROPER. MOREOVER, DEFENDANT'S SENTENCE CONSTITUTED AN APPROPRIATE EXERCISE OF THE TRIAL COURT'S DISCRETION. ..... 45

        A. The Imposition of Consecutive Sentences was Proper ........................................... 45

        B. Defendant's Sentence Constituted an Appropriate Exercise of the Trial Court's Discretion ........................................ 51

CONCLUSION -

    FOR ALL OF THE ABOVE REASONS, DEFENDANT'S JUDGMENT OF CONVICTION AND SENTENCE SHOULD BE AFFIRMED ............... 55

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,

          -against-

LONNIE TILLERY,

                    Defendant-Appellant.

Appellate Division
Docket Number
00-06289

Kings County
Indictment Number
6791/99

## RESPONDENT'S BRIEF

### PRELIMINARY STATEMENT

Defendant, Lonnie Tillery, appeals from a judgment of the Supreme Court, Kings County, rendered on June 27, 2000, convicting him of Murder in the First Degree (P.L. § 125.27[1][a][vii]) and Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03[2]).

Defendant was sentenced to an indeterminate term of imprisonment of twenty-five years to life on the murder conviction and a consecutive determinate term of fifteen years on the weapon-possession conviction. Additionally, defendant was sentenced to a consecutive term of imprisonment of one and one-third to four years on a violation of probation on a youthful offender adjudication for criminal possession of a controlled substance in the third degree under Kings County Indictment

Number 7158/96. Defendant's sentence was also ordered to run consecutively with a previously imposed term of imprisonment of five to fifteen years on another violation of probation under Kings County Indictment Number 982/97 (Goldberg, J., at pretrial hearings, trial, and sentence). Defendant is incarcerated pursuant to his judgment of conviction. There were no codefendants in this case.

## STATEMENT OF FACTS

### Introduction

On April 4, 1999, at about 5:00 a.m., on 35th Street in Brooklyn, defendant, together with a few accomplices, held up at gunpoint a group of people who were returning from a birthday party. The robbers stole money, jewelry, and watches from the victims. One of the victims, Mr. Rosiclair, tried to remove a necklace he was wearing to give to defendant, and when it would not come off, defendant shot him in the chest at point blank range, killing him. Mr. Rosiclair's hands were still on his necklace when he was shot and was not resisting the robbery in any way.

For these acts, defendant was charged by Kings County Indictment Number 6791/99 with one count of Murder in the First Degree (P.L. § 125.27[1][a][vii]), two counts of Murder in the Second Degree (P.L. § 125.25[1], [3]), two counts of Robbery in the First Degree (P.L. § 160.15[1], [2]), one count of Robbery in the Second Degree (P.L § 160.10[1]), one count of Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03[2]), one count of Criminal Possession of a Weapon in the Third Degree (P.L. § 265.02[4]), and one count of Criminal Possession of a Weapon in the Fourth Degree (P.L. § 265.01[1]).

The Wade/Huntley/Dunaway Hearing[1]

The People's Case

On April 4, 1999, Detective MICHAEL HINRICHS learned that Wendell Rosiclair had been shot on East 35th Street between Cortelyou and Clarendon Roads, in Brooklyn (Hinrichs: H. 10).[2] Detective Hinrichs interviewed several eyewitnesses from whom he received a description of the shooter, including that the shooter had worn a red "Coogie" brand sweater (Hinrichs: H. 10-15). Later that day, a confidential informant informed Detective Hinrichs that a person named "Lonnie" fit the description of the shooter and that he had seen Lonnie following the victims shortly before the shooting (Hinrichs: H. 16-17). Detective Hinrichs entered the information into a police computer database from which he obtained defendant's name and his photograph (Hinrichs: H. 18-19). Detective Hinrichs showed defendant's photograph to the confidential informant, and the informant identified defendant as the person whom he had seen following the victims

---

[1] The pretrial Wade/Huntley/Dunaway hearing was conducted on May 22, 2000. Because defendant raises no issue on appeal regarding most of the court's rulings on the Wade/Huntley/Dunaway hearing, those aspects of the proceedings that defendant is not raising on appeal are not summarized here.

[2] Numbers in parentheses refer to the pages of the trial transcript, dated May 22 through June 6, 2000. The names preceding page numbers refer to the witnesses whose testimony is cited. Number preceded by "H." refer to the pages of the transcript of the pretrial Wade/Huntley/Dunaway hearings, dated May 22, 2000. Numbers preceded by "S." refer to the sentencing transcript, dated June 27, 2000.

shortly before the shooting (Hinrichs: H. 20). Subsequently, Lieutenant VINCENT DIDONATO showed a photograph array including the photograph of defendant to one of the eyewitnesses to the shooting, and the eyewitness identified defendant as the shooter (Hinrichs: H. 23-24; DiDonato: H. 107).

In July 1999, Detective Hinrichs received a tip from Crime Stoppers that defendant was using the name "Matthew Thomas" and that he was in prison in Upstate New York (Hinrichs: H. 29, 63). Detective Hinrichs learned that an inmate in a prison in Rome, New York, was using that name (Hinrichs: H. 28-30). On July 27, 1999, Detective Hinrichs faxed a copy of defendant's fingerprints to the upstate prison to compare with Mathew Thomas' fingerprints and was informed that Mathew Thomas was, in fact, defendant (Hinrichs: H. 30). Detective Hinrichs also learned that a bench warrant had been issued for defendant's arrest because he had failed to appear for sentencing in Brooklyn on an unrelated drug conviction (Hinrichs: H. 70).

Detective Hinrichs attempted to make arrangements with the Office of the District attorney in Rome, New York, for defendant's arrest for the shooting but was unsuccessful because the Assistant District Attorney who was assigned to defendant's upstate case was on vacation (Hinrichs: H. 31, 73). Detective Hinrichs also attempted to make such arrangements with the

detectives who had arrested defendant upstate but they did not return his telephone calls (Hinrichs: H. 73).

On August 16 or 17, 1999, one of the prison deputies in Rome, New York, informed Detective Hinrichs that defendant was either going to be released on his own recognizance on the charges he was facing upstate or that those charges were going to be dismissed (Hinrichs: H. 31, 69-71). On August 17, 1999, Detective Hinrichs went to Rome, New York, and defendant was released into his custody (Hinrichs: H. 32).

During the drive back to Brooklyn, Detective Hinrichs asked defendant if he knew why he was being brought back to the city, and defendant replied that he believed it was because there was a bench warrant for his arrest (Hinrichs: H. 32, 75). Detective Hinrichs told defendant that they would speak to him when they arrived at the stationhouse in Brooklyn (Hinrichs: H. 76). When they arrived at the stationhouse in Brooklyn, Detective Hinrichs informed defendant that he was actually being detained pursuant to a murder charge (Hinrichs: H. 60-61).

Detective Hinrichs did not believe that defendant was still represented by counsel on the Brooklyn case for which the bench warrant had been issued because it was an old case (Hinrichs: H. 71). Detective Hinrichs did not know whether defendant was represented by counsel on the Upstate New York charges because the Assistant District Attorney assigned to defendant's case on

the upstate charges had been on vacation and Detective Hinrichs could not communicate with him (Hinrichs: H. 7o-72).

That evening, at about 8:30 p.m., at the stationhouse, defendant waived his Miranda rights and told the police that he had been present at the robbery and shooting but claimed that it had been "Arthur" and another person who had robbed and shot Mr. Rosiclair (Hinrichs: H. 57, 80-83). Defendant further stated that he later heard his name mentioned in relation to the shooting and therefore fled to Virginia and then to Upstate New York (Hinrichs: H. 58).

### The Defense Case

The defense presented no evidence (H. 123).

## The Arguments of Counsel and the Court's Decision

Defense counsel alleged that defendant had been represented by counsel on the charges in Rome, New York, and on the charges in Brooklyn for which the bench warrant had been issued (H. 124-26). Defense counsel further alleged that the police had conspired to have defendant released from custody in upstate so that defendant would be able to waive his Miranda rights in Brooklyn without the presence of counsel (H. 125). Defense counsel asserted that the police should have known that defendant was represented by counsel on the upstate case because the charges on the upstate case had not been dismissed (H. 125).

Defense counsel further asserted that the police should have known that defendant was represented by counsel on the drug-related Brooklyn charges because the bench warrant indicated that defendant was due in court on those charges (H. 125). Defense counsel argued that defendant's statements to the police should therefore be suppressed because counsel had not been present when defendant had waived his <u>Miranda</u> rights (H. 125-28).

The prosecutor argued that defendant had been able to waive his <u>Miranda</u> rights without the presence of counsel because he had not been in custody on the upstate charges or on the charges for which the bench warrant had been issued (H. 130-31).

The court credited the police testimony in its entirety (H. 132). The court found that -- because the police had conferred with the Offices of the District Attorneys in Rome and Brooklyn -- they presumably knew of the "status" of the prior cases and probably had obtained advice on how to proceed (H. 120). The court also found that the police had not executed the bench warrant before questioning defendant about the shooting (H. 133). The court held that the police are permitted to release a defendant from custody on charges for which he is represented by counsel in order to question the defendant on unrelated charges (H. 127). The court denied defendant's motion to suppress his statements (H. 133).

## The Trial

### The People's Case

On the night of April 3, 1999, RODNEY FRANCOIS was working as a disk jockey at the Trinity Club on Clarkson Avenue in Brooklyn (Francois: 67-68; LISA SMITH: 185; KEVIN CAESAR: 229; NEGESTI CHUNG: 320; JAMAL SONGUI: 481). He and his friends, JAMAL SONGUI, NEGESTI CHUNG, KEVIN CAESAR, and Wendell Rosiclair, together with SHANIQUE HARMON, LISA SMITH and REBECCA ETORIA, were at the club to celebrate Mr. Caesar's birthday (Francois: 72, 134; Smith: 184-85; Caesar: 229-31; Chung: 319-20; Harmon: 360-61; Songui: 481, 484; Etoria: 579).[3] Mr. Songui, Mr. Caesar, and Mr. Rosiclair, while partying, assisted Mr. Francois (Francois: 71; Smith: 185; Caesar: 229; Chung: 320; Songui: 481-84).

While entering the club that night, Ms. Etoria observed defendant -- who was wearing a red "Coogie" sweater and dark

---

[3] Mr. Francois drank about three or four little Champagne glasses of Champagne and Alize liquor and smoked a little bit of marihuana that night (Francois: 73, 139, 147, 149). Mr. Francois was feeling "nice" but was sober; he was fully functioning (Francois: 140, 175). Mr. Caesar drank more than one glass of Champagne, felt a "buzz," but was sober (Caesar: 231). Ms. Chung drank a glass and a half of Alize on ice at about 2:30 a.m. and was sober (Chung: 320-22). Ms. Etoria drank about one half of a bottle of Champagne and about one half of a bottle of Alize but was sober when she left the club (Etoria: 582-83). Mr. Songui drank about two glasses of Champagne and was sober (Songui: 499). The autopsy of Mr. Rosiclair revealed that he had a .11 blood alcohol level when he died (BARBARA SAMPSON: 459). Neither Ms. Smith nor Ms. Harmon drank any alcoholic beverages that night (Smith: 187; Harmon: 361-62).

pants -- and others, including a man wearing beige colored pants, a white and beige shirt, and a beige hat, jump the line leading into the club (Etoria: 581, 585, 587, 598). Inside the club, defendant attempted to dance with Ms. Etoria, and she moved away from him (Etoria: 584-85). Ms. Etoria later observed defendant sitting at the bar together with the man wearing beige-colored clothing who had jumped the line with defendant, together with another man who was wearing a gray "Enyce" sweatsuit (Etoria: 587). Defendant and the people he was with were wearing bandannas around their necks (Etoria: 587-88).

At the bar in the club, Mr. Caesar saw defendant wearing a red Coogie sweater talking to a man wearing a gray Enyce sweatsuit (Caesar: 244-50, 274, 315). The men were watching every move he and Mr. Rosiclair made (Caesar: 248, 272).

Between 4:30 and 5:00 a.m., the club closed, and the party ended (Francois: 73; Smith: 188; Caesar: 231; Chung: 322; Harmon: 362; Songui: 484; Etoria: 583). Mr. Rosiclair, Ms. Chung, and Mr. Songui left the club in Mr. Rosiclair's Land Cruiser (Francois: 75-76, 132; Smith: 182; Caesar: 233; Chung: 322-23; Songui: 485; Etoria: 586). Mr. Caesar, Mr. Francois, Ms. Harmon, and Ms. Smith left the club in a green Mazda driven by Mr. Caesar (Francois: 75-76; Smith: 188-89; Caesar: 233; Harmon: 363; Etoria: 586).

Mr. Rosiclair drove down New York Avenue and Mr. Caesar followed (Francois: 77; Smith: 189-90; Caesar: 233-34; Harmon: 363; Songui: 486). Ms. Smith and Ms. Harmon looked out the back window and noticed that a dark-colored jeep was following them (Smith: 190; Harmon: 364-65). Ms. Smith informed Mr. Caesar and Mr. Francois that they were being followed (Smith: 190). Mr. Francois and Mr. Caesar confirmed that a jeep was following them (Francois: 77; Caesar: 234, 284-86).

Mr. Rosiclair and Mr. Caesar drove to Ms. Chung's home on 35th Street, between Clarendon and Cortelyou Roads in Brooklyn (Francois: 77-78; Smith: 190; Caesar: 235; Chung: 323; Harmon: 365; Songui: 486; Etoria: 588). Mr. Francois, Mr. Caesar, Mr. Songui, Ms. Chung, and Mr. Rosiclair climbed out of the cars (Francois: 78; Smith: 193; Caesar: 235; Chung: 324; Harmon: 365; Etoria: 588). Mr. Francois, Mr. Caesar, Mr. Rosiclair, and Ms. Chung stood in front of Ms. Chung's home talking (Francois: 79; Smith: 193; Caesar: 235; Chung: 324; Harmon: 365). Mr. Songui joined in the conversation but then went between Ms. Chung's and her neighbor's home to urinate (Francois: 78; Smith: 193; Caesar: 235, 290; Chung: 324, 329; Harmon: 365; Songui: 486-88, 517, 533-37, 539-40; Etoria: 590).

Ms. Etoria, who had remained in the car, observed a jeep parking down the block (Etoria: 590). From the jeep emerged defendant, who was wearing a red Coogie sweater, the man in the

gray suit who Ms. Etoria had seen at the club and who now had a bandanna on his face, and a man wearing beige clothing, including a beige bandanna covering the lower half of his face and a beige baseball cap (Etoria: 590-94).[4]  The three men walked up the block, and defendant and the man in beige peered into the car in which Ms. Etoria was sitting (Etoria: 590, 600).  Ms. Etoria then observed Mr. Rosiclair handing his watch to defendant (Etoria: 594).  She also observed Mr. Caesar taking out his money (Etoria: 594).  Ms. Etoria heard Mr. Rosiclair asking "what do you want" and saw him clutching his necklace below his chin with both his hands (Etoria: 594).  Defendant then grabbed Mr. Rosiclair with his left hand, aimed the gun he was holding at Mr. Rosiclair's chest, and shot Mr. Rosiclair (Etoria: 595).  Defendant pushed Mr. Rosiclair and then fled with his accomplices to the jeep and drove away (Etoria: 596).

While talking with her friends, Ms. Chung observed three men standing at the corner (Chung: 325).  Ms. Chung was not alarmed because people often hung out on her block all night (Chung: 325).  The three men walked up the block, and when they were at Ms. Chung's driveway, she observed that one of them was wearing a

---

[4] Detective MICHAEL DOHERTY interviewed Ms. Etoria and took handwritten notes from which he later made a typewritten report (Doherty: 860-866).  While transferring his notes, Detective Doherty confused Ms. Etoria's description of defendant with the description she provided of one of the other robbers, thus mistakenly writing in the typewritten report that defendant had had on a baseball cap (Doherty: 860-69, 877).

brownish colored cap and a similarly colored scarf around his
face (Chung: 325). Another one of the men, defendant, was not
wearing a mask (Chung: 328, 344-45).[5] The man in the cap and
scarf pulled out a gun and said "y'all know what this is, be
easy, nobody move" (Chung: 328-29). Another one of the men
repeated what the man in the scarf and cap said (Chung: 329).
The men then demanded everyone's Rolex watches, chains, and money
(Chung: 329). Ms. Chung heard Mr. Caesar, Mr. Rosiclair, and Mr.
Francois pleading with the robbers not to hurt anyone, assuring
them that they would all comply with their demands (Chung: 329-
30). Ms. Chung saw defendant grab Mr. Rosiclair and demand his
necklace (Chung: 330). Mr. Rosiclair agreed to give him the
chain (Chung: 330, 331). Defendant then hit Mr. Rosiclair on the
head with his gun (Chung: 330, 331).[6] Mr. Rosiclair put his
hands on his necklace and told defendant he would give him
whatever he wanted (Chung: 331-32). Mr. Rosiclair told defendant
that he was trying to pop the necklace because he could not
unhook it (Chung: 332). Mr. Rosiclair did not resist the robbery

---

[5] At trial, Ms. Chung identified defendant as the shooter
but was not one hundred per cent sure (Chung: 345, 347).

[6] In a statement to the police, Ms. Chung recalled that it
was a masked robber that hit Mr. Rosiclair with the gun (Chung:
348, 350-51). At trial, Ms. Chung explained that she mistakenly
made that statement because she had been distraught at the time
(Chung: 353). Ms. Rosiclair also explained that her statement to
the police was consistent with defendant being the shooter
(Chung: 353-54).

in any way (Chung: 335). Ms. Chung then observed defendant hold Mr. Rosiclair's necklace with his left hand, extend his right arm, and shoot Mr. Rosiclair at point blank range with a gun in his right hand (Chung: 331-34). The robbers then fled to their jeep and drove away (Chung: 335).

While talking with his friends, Mr. Caesar observed that the jeep that had followed them was parking up the block (Caesar: 236, 281-82). Mr. Caesar was not alarmed because he concluded that the occupants of the jeep probably lived on that block (Caesar: 236, 283). Mr. Caesar returned his attention to the conversation he was having (Caesar: 236, 313). Suddenly, Mr. Caesar saw a man wearing a gray sweatsuit and with a gray bandanna on his face put a gun to Mr. Caesar's head (Caesar: 236). Nearby were three other men, one of whom was defendant who was wearing a red Coogie sweater (Caesar: 236, 290-91). The man in the gray sweatsuit told him "you know what this is" and to "run" his Rolex watch and other "stuff," meaning to give him his watch and other possessions (Caesar: 237). Mr. Caesar removed his watch and gave it to an outstretched hand (Caesar: 237).

Mr. Caesar then heard someone being hit and then heard Mr. Rosiclair scream (Caesar: 238-39). Mr. Caesar turned around and saw Mr. Rosiclair holding his hands up to his head and defendant and the man wearing the gray clothing standing next to Mr. Rosiclair pulling on his necklace (Caesar: 239-40, 291). Mr.

Caesar heard them demand Mr. Rosiclair's money (Caesar: 240).
Mr. Rosiclair told them to take whatever they wanted (Caesar:
241). Mr. Rosiclair's arms were bent upward in front of him at
about a ninety-degree angle, and his hands were at shoulder
height (Caesar: 241, 291). Mr. Rosiclair was not fighting or
struggling (Caesar: 241). Mr. Caesar looked away, heard a "pop,"
looked back toward Mr. Rosiclair, and saw defendant and his
accomplices run to the jeep and drive away (Caesar: 241).

Mr. Francois who had been facing away from Cortelyou Road
when defendant approached, saw defendant walk past him, wearing a
blue "skully" cap and carrying a gun (Francois: 79, 130-31, 160-
61, 169-70). Mr. Francois heard defendant announce "You all know
what this is?" and demanded that they all "run the Rolees"
meaning that they were to give him their Rolex watches (Francois:
79-80). Mr. Rosiclair and Mr. Caesar were wearing Rolex watches
(Francois: 133). Three other men wearing masks accompanied
defendant (Francois: 80, 164-65). One of the men was wearing a
blue winter hat; one was wearing a dark bandanna mask; and one
was wearing a beige bandanna and hat (Francois: 83, 162-63).[7]
All of them were armed (Francois: 89). One of defendant's
accomplices held a gun to Mr. Caesar's head and demanded his

_____

[7] At trial, Mr. Francois identified a beige hat and bandanna
as belonging to the accomplice that had worn a beige outfit
(Francois: 126-29). The hat and bandanna were entered into
evidence at trial as People's Exhibit Five (129-30, 653-54).

watch (Francois: 80). Another one of the accomplices demanded Ms. Chung's earrings (Francois: 80, 166).

Mr. Francois saw defendant and one of his accomplices grab Mr. Rosiclair and reach into Mr. Rosiclair's pockets (Francois: 81, 83, 166). One of them took Mr. Rosiclair's watch (Francois: 81, 83, 166). Mr. Rosiclair pleaded with defendant to "chill" and promised that that he would give defendant anything he wanted, even his truck (Francois: 81). Defendant hit Mr. Rosiclair on the head with his gun (Francois: 81). Mr. Rosiclair tugged with both of his hands at the necklace he was wearing in order to rip it off his neck to give it to defendant (Francois: 81). Defendant also grabbed the necklace and yanked it (Francois: 81). Mr. Francois heard Mr. Rosiclair tell defendant that he was trying to snap the necklace but that it would not snap (Francois: 84). Mr. Francois then saw defendant clench Mr. Rosiclair's necklace with his left hand and shoot him with a revolver in his right hand which was about six inches from Mr. Rosiclair's body (Francois: 85-90, 167-68). Mr. Rosiclair's hands were still on his necklace when he was shot (Francois: 86). Mr. Francois then observed defendant and his accomplices run toward Cortelyou Road and drive away in a black jeep (Francois: 90-91, 168).

While Mr. Songui was urinating, he heard people demanding jewelry, money, and Rolex watches (Songui: 490, 518).[8] Mr. Songui looked out from where he was standing and saw defendant -- whom he had seen at nightclubs on several occasions and who was wearing a red Coogie sweater and a dark cap -- yank Mr. Rosiclair's necklace (Songui: 490-91, 502-03, 509-10). Mr. Rosiclair's hands were also on the necklace (Songui: 490-91). Another man was wearing a brown fitted hat on his head and a scarf wrapped around his face (Songui: 492). Mr. Rosiclair repeatedly told defendant that he would take off the necklace (Songui: 492). Mr. Songui saw defendant push off Mr. Rosiclair with his left hand and shoot at close range Mr. Rosiclair with a gun he was holding in his right hand (Songui: 492-93). Mr. Songui began chasing the fleeing robbers but gave up the chase when Mr. Rosiclair called out his name (Songui: 496).[9]

Ms. Smith, who had remained in the car, observed at the corner of the block three men climb out of the jeep that had been following them (Smith: 194). When the men came closer, Ms. Smith told Ms. Harmon, who was with her in the car, that something was wrong and asked her to duck her head down (Smith: 194). Ms.

---

[8] In 1993, Mr. Songui was convicted of attempted sexual misconduct, a class B misdemeanor (Songui: 511).

[9] In his statements to the police, Mr. Songui did not identify defendant as the shooter because, initially, Mr. Songui wanted to kill defendant in revenge for killing Mr. Rosiclair (Songui: 504-07, 512-13, 521-26, 529-30).

Smith observed that one of the men, whom she had seen at the club that night taking photographs, was wearing a red Coogie sweater (Smith: 194-95, 196, 200, 203, 210-11). Another one of the men was wearing a beige suit and a beige scarf wrapped around his face (Smith: 195, 214).[10] All of the men had guns (Smith: 196). Ms. Smith observed Ms. Chung removing her earrings and Mr. Caesar removing his watch (Smith: 196). Ms. Smith observed Mr. Rosiclair indicate with his hand to wait and then observed him tugging at his necklace with his hands (Smith: 197). Ms. Smith then saw the man in the red Coogie sweater move his shoulder back and aim and shoot at Mr. Rosiclair at close range while Mr. Rosiclair's hands were still tugging at his necklace (Smith: 198, 201). The men then returned to their jeep and fled (Smith: 201-02).

Ms. Harmon, who had also remained in the car, observed four men down the block emerge from the jeep that had followed them (Harmon: 365-66, 384). Ms. Harmon observed three of the men walk up the block toward where she was sitting (Harmon: 366). One of the men was wearing a red Coogie sweater and a bandanna around his neck (Harmon: 367-68). Another one of the men was wearing a mask on his face (Harmon: 368). She observed that two of the men

---

[10] At trial, Ms. Smith identified a beige hat and scarf, entered into evidence at trial as People's Exhibit Five, as the ones worn by one of the accomplices (Smith: 215; 653-54, 657).

were armed with guns (Harmon: 370-71). The men approached Mr. Rosiclair, Mr. Francois, Ms. Chung, and Mr. Caesar and demanded their jewelry (Harmon: 368-69). Ms. Harmon observed Ms. Chung remove her earrings and Mr. Caesar and Mr. Rosiclair remove their watches and give those items to the robbers (Harmon: 369). The man wearing the red Coogie sweater then demanded Mr. Rosiclair's necklace (Harmon: 370). Mr. Rosiclair pulled on his chain with both of his hands (Harmon: 370). Mr. Rosiclair told the man with the red sweater that he could not get the chain off his neck (Harmon: 372). Mr. Rosiclair was not resisting the robbery (Harmon: 373). Ms. Harmon then observed the man with the red Coogie sweater shoot Mr. Rosiclair in the chest from about eight inches away (Harmon: 372-73). After the shooting, the robbers fled to the jeep and drove away (Harmon: 373).

Shortly after the shooting, Police Officer RASID JUPITER received a radio call and drove to 446 East 35th Street, the scene of the shooting (Jupiter: 393; Songui: 496-97). When Officer Jupiter arrived, he saw a group of people screaming and acting erratic (Jupiter: 393). Officer Jupiter observed a man, whom he later learned to be Wendell Rosiclair, lying on the ground and someone holding a towel against him (Jupiter: 393-94). Officer Jupiter radioed for an ambulance and for police backup and started a crime scene investigation (Jupiter: 394). An ambulance arrived to treat Mr. Rosiclair, and Officer Jupiter

vouchered the clothing that Mr. Rosiclair had been wearing when he was shot (Francois: 395-96). Mr. Songui attempted to accompany Mr. Rosiclair in the ambulance, and when they refused to let him ride along in the ambulance, he got into a scuffle with a police officer and was arrested (Chung: 337-39). Later that morning, Officer Rosiclair went to the morgue where he identified Mr. Rosiclair's body (Jupiter: 397-98).

At about 8:30 that morning, at the 67th Precinct, Detective MICHAEL HINRICHS interviewed the eyewitnesses to the robbery and shooting (Hinrichs: 649-51). On April 8, 1999, Detective Hinrichs arrested Shiloh Hylton at his parole office (Hinrichs: 652). Mr. Hylton was wearing a beige hat and bandanna, which the detective vouchered.[11] The police also recovered from Mr. Hylton a photograph of defendant's son (Hinrichs: 729-30; LAMOUR CHRISTIAN: 816-17). Detective Hinrichs arranged a lineup in which Rebecca Etoria identified Mr. Hylton as one of the robbers (Hinrichs: 655-58; Etoria: 604-08).

On August 17, 1999, Detective Hinrichs arrested defendant in Rome, New York (Hinrichs: 663-64, 668-69). Detective Hinrichs brought defendant back to Brooklyn (Hinrichs: 665). At the stationhouse, defendant waived his Miranda rights and told Detective Hinrichs that he had been at the club on Clarkson

---

[11] The hat and bandanna were admitted into evidence at trial as People's Exhibit Five (653-54, 657).

Street with Arthur and three other people, and that Arthur had told him about someone who had a Rolex whom he intended to rob (Hinrichs: 669-75, 705). Defendant stated that, when the party was over, he, Arthur, and two others followed another jeep in their jeep (Hinrichs: 675).

Defendant further stated that, when the jeep they were following parked in front of a house and the occupants climbed out, Arthur and one the people in their jeep pulled out guns and robbed two men in the group (Hinrichs: 676). Defendant claimed that Arthur and his accomplice were returning to their jeep when the accomplice warned Arthur that one of the victims was "reaching," that Arthur turned and fired a shot, and that the victim fell to the ground (Hinrichs: 676). Defendant further claimed that the accomplice asked Arthur why he shot the victim and that Arthur replied that he shot him because the accomplice had warned him that he was reaching (Hinrichs: 676). Defendant stated that, after the shooting, he heard his name being mentioned and so he fled to Virginia and then to Upstate New York (Hinrichs: 676).

Detective Hinrichs wrote down defendant's statement but defendant refused to sign it, claiming that he was afraid that, if he signed it, then Arthur would be arrested and that Arthur would then implicate him in the shooting (Hinrichs: 677-79). Detective Hinrichs asked defendant if he wished to make a

videotaped statement, and defendant declined the offer (Hinrichs: 707, 715, 773, 775-77).

That night Detective Hinrichs placed defendant in two lineups (Hinrichs: 716). Mr. Francois, Mr. Caesar, Ms. Chung, and Ms. Etoria, each viewed one of the lineups (Francois: 92-109, 130-31; Francois: 244-50; Chung: 339-41; Etoria: 611-16; Hinrichs: 719-24). Mr. Francois, Ms. Chung, and Ms. Etoria identified defendant as the shooter; Mr. Caesar identified defendant as one of the robbers but did not know if he was the shooter (Francois: 130-31; Caesar: 244-50; Chung: 339-41; Etoria: 611-16).[12]

ROBERT SCHMIDT, an expert criminologist, determined that there was gunshot residue on the left sleeve of Mr. Rosiclair's jacket (Schmidt: 399-409). The gunshot residue created a pattern about an inch and one quarter in diameter around a bullet hole (Schmidt: 409).

Detective STEVEN FIORICA, an expert ballistics and firearms analyst, concluded that a pattern of gunshot residue around a bullet hole about one and one half inches in diameter would indicate that the gun had probably been fired from no more than ten inches away (Fiorica: 554, 560). Detective Fiorica weighed the bullet recovered from Mr. Rosiclair's body and determined

---

[12] Ms. Chung was not 100% certain that defendant was the shooter (Chung: 341).

that its weight indicated that it was probably a .38 caliber bullet, which virtually always is fired from a revolver (Fiorica: 562).

Doctor BARBARA SAMPSON, a medical examiner and expert forensic pathologist, performed an autopsy on the body of Mr. Rosiclair (Sampson: 446). Mr. Rosiclair had a bullet entry hole in the lateral aspect of his left arm, several inches below the elbow but closer to the elbow than to the wrist (Sampson: 447-50, 460). The bullet traveled through the muscle, missing the bone, and exited the medial part of the left upper arm, slightly above the left elbow on the inside of the arm (Sampson: 448, 460-61, 470). Mr. Rosiclair had an irregular entry bullet hole under his left nipple, through which the bullet had then entered (Sampson: 448, 450-51, 466). The bullet had fractured the eighth rib and had traveled through the heart, diaphragm, liver, and abdomen causing his death (Sampson: 448, 453, 464). An irregular, or imperfectly round, entry hole is caused by a wobbling bullet, which is itself caused when a bullet first passes through another object before entering the object with the irregular entry hole (Sampson: 450-51, 466-67). Doctor Sampson concluded from the position of the three bullet holes that Mr. Rosiclair's arm must have been bent upward at slightly more than a ninety degree angle when he was shot: there was no other way to line up the holes in a straight line, which is the path a bullet takes even when

having first traveled through flesh (Sampson: 453, 461, 465, 467-68, 470). Doctor Sampson demonstrated with her body that Mr. Rosiclair, when he was shot, had had his left arm bent so that his left hand was in front of the right part of his chest (Sampson: 462). Doctor Sampson also concluded that defendant's gun must have been directly in front of Mr. Rosiclair and pointed straight at him when he was shot, otherwise the bullet entry hole in Mr. Rosiclair's arm would have had an irregular abrasion around the hole, which it did not have (Sampson: 471-72). Mr. Rosiclair also had a laceration below the left eyebrow that had been inflicted within no more than a few hours before his death and was consistent with having been inflicted by a gun striking him in the face (Sampson: 454, 466). Doctor Sampson opined that gunshot residue on an object indicates that the gun had been fired from less than three feet away from the object (Sampson: 455-56).

The parties stipulated that defendant's date of birth was July 10, 1979 (814).

### Defendant's Case

Defendant presented no evidence on his own behalf (887-89).

## The Verdict and the Sentence

On June 6, 2000, the jury found defendant guilty of Murder in the First Degree (P.L. § 125.27[1][a][vii]) and Criminal

Possession of a Weapon in the Second Degree (P.L. § 265.03[2]) (1099-1102).

On June 27, 2000, the court sentenced defendant to an indeterminate term of imprisonment of twenty-five years to life on the murder conviction and a consecutive determinate term of fifteen years on the weapon-possession conviction (S. 17). Additionally, defendant was sentenced to a consecutive term of imprisonment of one and one-third to four years on a violation of probation on a youthful offender adjudication for criminal possession of a controlled substance in the third degree under Kings County Indictment Number 7158/96 (S. 3-4, 15, 17). The court also ordered defendant's sentence to run consecutively with a previously imposed term of imprisonment of five to fifteen years on another violation of probation under Kings County Indictment Number 982/97 (S. 17).

POINT I

<u>THE HEARING COURT PROPERLY DETERMINED THAT DEFENDANT HAD NOT BEEN IN CUSTODY ON AN UNRELATED CASE WHEN HE MADE HIS STATEMENT TO THE POLICE AND THAT THEREFORE PRESENCE OF COUNSEL HAD NOT BEEN NECESSARY FOR DEFENDANT TO HAVE WAIVED HIS MIRANDA RIGHTS IN THIS CASE.</u>

Defendant claims that his statement to the police should have been suppressed because he alleges that, at the time he made his statement, he was represented by counsel on two prior unrelated charges, and thus presence of counsel was necessary for defendant to have waived hi <u>Miranda</u> rights. Specifically, defendant alleges that, at the time the police interrogated him, he was represented by counsel on charges for which he had previously been detained in Rome, New York. Defendant also alleges that, at the time the police interrogated him, he was represented by counsel on charges for which he had been convicted in Kings County but had absconded prior to sentencing and for which a bench warrant for his arrest had been issued. The claim is meritless.

A defendant in custody who is represented by counsel may not be interrogated in the absence of counsel on the matter for which he is represented or even on an unrelated matter. <u>See</u> <u>People v. Burdo</u>, 91 N.Y.2d 146; <u>People v. Rosa</u>, 65 N.Y.2d 380 (1985); <u>People v. Rogers</u>, 48 N.Y.2d 167 (1979). Thus, such a defendant cannot waive his <u>Miranda</u> rights on any criminal charges without

the presence of counsel. Id. Where, however, a defendant who is represented by counsel is not in custody on the charges for which he is represented by counsel, such defendant may waive his Miranda rights without the presence of counsel and be interrogated about those charges for which he is not represented by counsel. See People v. Steward, 88 N.Y.2d 496 (1996); People v. Bing, 76 N.Y.2d 331, 350 (1990). Thus, a defendant in custody who is represented by counsel on a prior pending charge for which he is not presently in custody does not have an indelible right to counsel that may only be waived in the presence of counsel. Id.

In this case, at the time defendant was interrogated, he was not in custody on the charges for which he alleges he had been represented by counsel. As a preliminary matter, defendant did not establish on the record that he was, in fact, represented by counsel on either of his prior unrelated charges and that he was not acting pro se on those charges or that he was still represented by counsel on those charges. In any event, at the time he was interrogated, defendant was not in custody on the charges for which he was previously convicted in Kings County because he had absconded and a bench warrant for his arrest had been issued. See People v. Acosta, 259 A.D.2d 422 (1st Dep't 1999). Nor was defendant in custody on the charges for which he had been detained in Rome, New York, because he had been released

on his own recognizance on those charges. Accordingly, because defendant was not in custody on the charges for which he alleges he was represented by counsel, the hearing court properly ruled that presence of counsel was unnecessary for defendant to have waived his Miranda rights in this case.

Defendant's additional claim that his statement to the police should have been suppressed because he was released from custody in Rome, New York, solely to permit the police to question him on his present case without the presence of counsel is unsupported by the record and without merit.

At the suppression hearing, Detective Hinrichs testified that the deputy of the prison informed him without any prior warning that they were imminently going to release defendant from custody in Rome, New York (Hinrichs: H. 31). Detective Hinrichs further testified that the deputy in the prison informed him that he would have to come immediately to take custody of defendant because they could continue to detain him only for a short period of time (Hinrichs: H. 31). Thus, contrary to defendant's assertion on appeal, the evidence adduced at the hearing was that the police conspired to keep defendant in custody for a short while longer, not to release him from custody sooner (Hinrichs: H. 31).

The hearing court credited Detective Hinrichs' testimony in its entirety (H. 132). The hearing court's findings should be

accorded great deference upon review because the court, in hearing the evidence, was in a unique position to have observed the demeanor of the witnesses and to have judged the evidence presented.  See People v. Prochilo, 41 N.Y.2d 759 (1977). Therefore, its determinations of credibility and assessments of evidence should not be disturbed on appeal unless such determinations and assessments were patently erroneous.  See People v. Young, 186 A.D.2d 699 (2d Dep't 1992); People v. Davis, 166 A.D.2d 604 (2d Dep't 1990).  Furthermore, in reviewing the evidence, this Court must view the evidence in the light most favorable to the People.  See People v. Dreilich, 123 A.D.2d 441, 443 (2d Dep't 1986) (evidence adduced at suppression hearing must be reviewed in light most favorable to the People).

Defendant places misplaced reliance on the hearing court's remark that the police probably obtained advice from the District Attorney on how to proceed (Defendant's Brief at 17; H. 125).  In light of the hearing court's crediting the testimony of Detective Hinrichs, the hearing court could not have meant that the police conspired with the District Attorney in Upstate New York to release defendant from custody.  Rather, it is likely that the hearing court was simply observing that the police had probably consulted with the Kings County District Attorney about whether they were permitted to question defendant without the presence of counsel.

Moreover, even if defendant had been released from custody in Rome, New York, solely to permit the police to interrogate him on the present case, suppression still would not have been warranted. See People v. Robles, 72 N.Y.2d 689 (1988) (defendant's statements were properly admitted at trial where charges on unrelated case were dismissed solely to permit police to interrogate defendant on present charges without presence of counsel).

In any event, in light of the overwhelming evidence of defendant's guilt in this case, any error in the admission of defendant's statement to the police was harmless beyond a reasonable doubt. See People v. Crimmins, 36 N.Y.2d 230 (1975). In his statement to the police, defendant admitted to being present but denied participating in the robbery or shooting the victim. At trial, four eyewitnesses identified defendant as the shooter, five eyewitnesses identified defendant as having been one of the robbers, six eyewitnesses implicated defendant in the shooting, and seven eyewitnesses implicated defendant in the robbery.[13] Accordingly, because defendant in his statement to the police denied participating in the robbery and shooting and

---

[13] Ms. Etoria, Mr. Francois, Ms. Chung, and Mr. Songui identified defendant as the shooter and one of the robbers. Mr. Caesar identified defendant as one of the robbers but did not recall whether defendant was the shooter. Ms. Smith and Ms. Harmon identified the shooter as the person wearing the red Coogie sweater, which the other eyewitnesses identified defendant as having worn on the night of the shooting.

because there was other overwhelming evidence of defendant's presence at the robbery and shooting, there is no reasonable possibility that that the admission of defendant's largely exculpatory statement affected the outcome of the trial.

In sum, defendant's claim that his statement to the police should have been suppressed because he was represented by counsel on unrelated charges is meritless and harmless beyond a reasonable doubt. Accordingly, defendant's judgment of conviction should be affirmed.

## POINT II

DEFENDANT'S CLAIM THAT HE WAS DENIED A FAIR TRIAL BECAUSE THE PROSECUTOR ELICITED THAT DEFENDANT DECLINED TO MAKE A VIDEOTAPED STATEMENT IS MERITLESS. IN ANY EVENT IN LIGHT OF THE COURT'S LIMITING INSTRUCTION TO THE JURY REGARDING THAT EVIDENCE AND THE OVERWHELMING EVIDENCE OF DEFENDANT'S GUILT IN THIS CASE, ANY ERROR IN THE ADMISSION OF THAT FACT WAS HARMLESS BEYOND A REASONABLE DOUBT.

Defendant's claim that he was denied a fair trial because the prosecutor elicited that defendant declined to make a videotaped statement is meritless. In any event, in light of the court's limiting instruction to the jury regarding that evidence and the overwhelming evidence of defendant's guilt in this case, any error in the admission of that evidence was harmless beyond a reasonable doubt.

A defendant's silence in the face of criminal charges may not be used at trial to establish the defendant's consciousness of guilt. See People v. Conyers, 52 N.Y.2d 454, 458 (1981). A defendant may have many reasons for remaining silent, and thus, his post-arrest silence is ambiguous and is not necessarily a reflection of a consciousness of guilt. Id. Accordingly, post-arrest silence generally may not be used to establish a defendant's consciousness of guilt or to impeach a defendant's credibility as a witness. Id.

Where, however, a defendant's post-arrest silence is used for a purpose other than to establish a defendant's consciousness

of guilt or to impeach a defendant's credibility as a witness, it may be admissible. Thus, a defendant's decision not to answer questions after receiving Miranda warnings may be admitted into evidence at trial to provide the context of the inclupatory statements that the defendant did make. See People v. Ruiz, 181 A.D.2d 417 (1st Dep't 1992). Also for example, a defendant who testifies at trial on his own behalf may be cross-examined about significant omissions in his post-arrest statements to the police. See People v. Savage, 50 N.Y.2d 673 (1980).

In this case, the admission into evidence at trial of defendant's declination to make a videotaped statement was proper because it was not used to show defendant's consciousness of guilt. Indeed, the trial court specifically instructed the jurors that they could not use that evidence for that purpose. Rather, it was admitted solely to establish the context of the inclupatory statements that defendant made.

At trial, the prosecutor introduced into evidence defendant's oral statement to the police. The prosecutor then elicited from Detective Hinrichs that he wrote down defendant's statement, that defendant refused to sign the written statement, and that defendant subsequently declined to make a videotaped statement. On summation, the prosecutor argued that the fact that defendant declined to make a videotaped statement was evidence that defendant, in fact, had made the oral statement

attributed to him and that the statement had been voluntarily made.

Specifically, the prosecutor argued that because there was no videotaped statement, if the police were corrupt and had fabricated defendant's oral statement, then they could have recorded in their written statement that defendant had confessed to being the shooter (1009). The prosecutor also argued that, if the police had coerced defendant into making an oral statement, then they could have coerced defendant into making a videotaped statement as well (1010). Thus, the prosecutor argued that the absence of a videotaped statement was evidence that defendant's oral statement had been voluntarily made (1010). At no time during trial, however, did the prosecutor urge the jury to consider defendant's declination to make a videotaped statement as an indication of defendant's consciousness of guilt.

In its charge to the jury, the court explicitly instructed the jury not to use defendant's subsequent pretrial silence as an indication of his consciousness of guilt:

> You heard testimony at this trial that the defendant refused to sign the statement and declined to speak to an assistant district attorney.
>
> The law allows the defendant to do this, and <u>you should not assume that the defendant is guilty or draw any unfavorable inference to the defendant because he exercised his right not to sign this statement or exercise</u>

> his right not to speak any further about the
> case.
>
> Nevertheless, you may consider the
> testimony you heard about this conduct on the
> part of the defendant insofar as it may bear
> on you evaluation of the statement that the
> defendant did make to the police.

(1047) (emphasis added).

In any event, in light of the overwhelming evidence of defendant's guilt in this case and in light of the court's instruction to the jury on this matter, any error in the admission of that evidence was harmless beyond a reasonable doubt. See People v. Davis, 61 N.Y.2d 202 (1984) (comment on post-arrest silence did not require reversal because proposed curative instruction to jury would have been sufficient to cure error); People v. Crimmins, 36 N.Y.2d 230 (1975); People v. Davis, 223 A.D.2d 652 (2d Dep't 1996) (overwhelming evidence of guilt rendered harmless comment on post-arrest silence); People v. Sutherland, 219 A.D.2d 523 (1st Dep't 1995) (overwhelming evidence of guilt rendered harmless comment on post-arrest silence); People v. Carpenter, 199 A.D.2d 524 (2d Dep't 1993) (court's curative instruction cured comment on post-arrest silence). In this case, the overwhelming evidence of defendant's guilt included the testimony of four eyewitnesses who identified defendant as the shooter, five eyewitnesses who identified defendant as having been one of the robbers, six eyewitnesses who implicated defendant in

the shooting, and seven eyewitnesses who implicated defendant in the robbery. Moreover, the forensic evidence established that defendant shot the victim at close range while the gun was pointed directly at the victim's chest. Accordingly, because there was overwhelming evidence of defendant's guilt in this case, any error in the admission of the challenged evidence was harmless beyond a reasonable doubt.

In sum, defendant's claim is meritless and harmless. Accordingly, defendant's judgment of conviction should be affirmed.

## POINT III

DEFENDANT'S CLAIM THAT THE COURT ERRED IN PERMITTING MS. CHUNG AND MR. SONGUI TO IDENTIFY DEFENDANT IN COURT WITHOUT FIRST SUBJECTING THEM TO ANY PRIOR IDENTIFICATION PROCEDURES IS PARTIALLY UNSUPPORTED BY THE RECORD AND ENTIRELY MERITLESS. IN ANY EVENT, IN LIGHT OF THE OVERWHELMING EVIDENCE OF DEFENDANT'S GUILT IN THIS CASE, ANY ERROR IN THE COURT'S RULING WAS HARMLESS.

Defendant's claim that the court erred in permitting Ms. Chung and Mr. Songui to identify defendant in court without first subjecting them to any prior identification procedures is partially unsupported by the record and entirely meritless. In any event, in light of the overwhelming evidence of defendant's guilt in this case, including the unimpeached in-court identification of defendant by three other eyewitnesses and the relative weakness of Ms. Chung's and Mr. Songui's testimony, any error in the admission of the challenged in-court identifications was harmless.

At trial, Ms. Chung, in fact, identified defendant as the shooter in a pretrial lineup to the same extent that she did at trial (Chung: 339-41, 344-45). Both during the lineup and at trial, Ms. Chung identified defendant as the shooter but stated on both occasions that she was not one hundred percent sure about her identification of defendant (Chung: 339-41, 344-45).

Moreover, a defendant has no constitutional right to a lineup, nor is a defendant entitled to be viewed for

identification purposes prior to trial. See People v. Medina, 208 A.D.2d 771 (2d Dep't 1994). An in-court showup at trial is proper because the inherent suggestiveness of the showup is witnessed by the jury and factored into its evaluation of the worth of the identification. See People v. Morales, 228 A.D.2d 704 (2d Dep't 1996); People v. Alexander, 227 A.D.2d 498 (2d Dep't 1996); People v. Medina, 208 A.D.2d at 772; People v. Saunders, 166 A.D.2d 546 (2d Dep't 1990) (in-court showup identification was proper despite fact that seven years elapsed from date of crime and witness had not participated in any prior identification procedure).

It should also be noted that defendant failed to suggest any alternatives to the in-court identification procedures and proceeded on cross-examination to explore the weaknesses in Ms. Chung's and Mr. Songui's identification. See People v. Medina, 208 A.D.2d at 772; People v. Jackson, 167 A.D.2d 420 (2d Dep't 1990).

In any event, in light of the overwhelming evidence of defendant's guilt in this case, including the unchallenged in-court identification of defendant by three other eyewitnesses and the relative weakness of Ms. Chung's and Mr. Songui's testimony, any error in the admission of the challenged in-court identifications was harmless. The overwhelming evidence of defendant's guilt in this case included the eyewitness testimony

of Mr. Francois, Mr. Caesar, and Ms. Etoria, each of whom identified defendant in a pretrial procedure. Additionally, Ms. Harmon and Ms. Smith implicated defendant in the shooting by identifying the shooter as the one having worn a red "Coogie" sweater, which the other eyewitnesses identified defendant as having worn. See People v. Boone, 251 A.D.2d 423 (2d Dep't 1998) (where other eyewitnesses identified defendant, witness' in court showup did not deny defendant fair trial).

Moreover, there is no reasonable likelihood that Mr. Songui's and Ms. Chung's testimony affected the outcome of the trial. The evidence before the jury was that Mr. Songui had a criminal record and that he had originally denied to the police that he was able to identify the shooter. The jury also had before it Ms. Chung's ambivalent testimony that defendant was the shooter. Thus, it is unlikely that Mr. Songui's and Ms. Chung's testimony was more persuasive to the jury than the testimony of the other eyewitnesses. By contrast, there was no evidence that the other eyewitnesses had criminal records, had lied to the police when reporting the incident, or had been ambivalent in their identification of defendant. Accordingly, any error in the admission of Mr. Songui's or Ms. Chung's in-court identification of defendant is harmless.

In sum, contrary to defendant's claim on appeal, Ms. Chung, in fact, identified defendant in a pretrial lineup. Moreover,

Ms. Chung's and Ms. Songui's in-court identification of defendant were proper. Finally, in light of the overwhelming evidence of defendant's guilt in this case, including the unimpeached in-court identification of defendant by three other eyewitnesses and the relative weakness of Ms. Chung's and Mr. Songui's testimony, any error in the admission of their in-court identification was harmless.

POINT IV

DEFENDANT FAILED TO PRESERVE HIS LEGAL SUFFICIENCY
CLAIMS. IN ANY EVENT, THE PEOPLE PROVED DEFENDANT'S
GUILT BEYOND A REASONABLE DOUBT.

Defendant's sufficiency of the evidence claim is unpreserved for appellate review. On appeal, defendant claims that there was legally insufficient evidence that he intended to kill his victim. After the defense rested at trial, defendant moved for a trial order of dismissal, arguing only that the People "have not met their burden sufficiently to have this case go to the jury along with the crimes charged" (890). Accordingly, defendant's argument on appeal that there was legally insufficient evidence of his intent to kill was not raised with any specificity at trial and is, thus, unpreserved for appellate review. See People v. Finger, 95 N.Y.2d 894 (2000); People v. Gray, 86 N.Y.2d 10, 19 (1995); People v. Norman, 85 N.Y.2d 609 (1995).

Moreover, the claim is meritless. Where a defendant argues that the evidence supporting a conviction was legally insufficient, the evidence should be reviewed in the light most favorable to the prosecution to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 309 (1979) (emphasis in original); People v. Rossey, 89 N.Y.2d 970, 971 (1997); People v. Contes, 60 N.Y.2d 620, 621

(1983). The People are entitled to every reasonable inference that can be drawn from the evidence, People v. Ford, 66 N.Y.2d 428, 437 (1985). Great deference should be accorded to the jury's determination because, as the trier of fact, it had the "opportunity to view the witnesses, hear the testimony and observe demeanor." People v. Bleakley, 69 N.Y.2d 490, 495 (1987).

In this case, when viewing the evidence in the light most favorable to the People, there was legally sufficient evidence to establish that defendant killed his victim intentionally.

"Intent may be inferred from conduct as well as the surrounding circumstances." People v. Steinberg, 79 N.Y.2d 673, 682 (1992).

Six eyewitnesses testified that defendant shot the victim at point blank range. The forensic evidence corroborated their testimony. Police Officer Fiorica, an expert ballistics and firearms analyst, testified that the gunshot residue on the victim's clothing established that the victim had probably been shot at from a distance of not more than ten inches away, and at most from no more than three feet away.

The eyewitnesses saw defendant pull back from the victim, draw his right arm, aim the gun at the victim's chest, and pull the trigger (Francois: 85-90, 167-68; Smith: 198, 201; Chung: 331-34; Harmon: 372-73; Songui: 492-93; Etoria: 595).

The forensic evidence corroborated that testimony as well. The medical examiner testified that the bullet holes in the victim established that he had been shot from a gun that had been aimed straight at his chest, and had not been shot from a gun aimed at an angle toward his chest.

The eyewitnesses further testified that the victim had not been resisting and that he had been tugging at his necklace when he was shot. The forensic evidence corroborated that testimony too. The forensic evidence established that the victim's left arm was folded, at a greater than ninety degree angle, against his chest when he was shot.

Thus, because the eyewitness testimony and the forensic evidence both established that defendant aimed his gun at point blank range directly at the unresisting victim's chest, the jury was entitled to infer that defendant intended to kill his victim. See People v. Henning, 267 A.D.2d 1092 (4th Dep't 1999) (intent to kill inferred where defendant shot victim at close range); People v. McNamee, 266 A.D.2d 162 (1st Dep't 1999) (intent to kill inferred where defendant aimed gun at victim and pulled trigger); People v. Holmes, 260 A.D.2d 942 (3d Dep't 1999) (intent to kill inferred from gunshot at close range to victim's head); People v. Mason, 254 A.D.2d 109 (1st Dep't 1998) (intent to kill inferred where defendant shot victim at close range); People v. McDowell, 216 A.D.2d 419 (2d Dep't 1995) (single shot

was sufficient to support murder conviction); <u>People v. Strong</u>, 201 A.D.2d 594 (2d Dep't 1994) (intent to kill inferred where defendant pulled trigger within close range of victim's chest); <u>People v. Smith</u>, 197 A.D.2d 717 (1st Dep't 1993) (intent to kill inferred where defendant stood over victim and fired gun); <u>People v. Santana</u>, (1st Dep't 1991) (intent to kill inferred where defendant shot victim at close range).

Defendant's claim that defendant could not have intended to kill his victim because the bullet first passed through the victim's arm is meritless. The eyewitnesses all testified, and the forensic evidence established, that the victim's arm had been drawn up directly in front of his chest when he was shot. Moreover, the eyewitnesses testified that defendant had aimed his gun at the victim's chest. Accordingly, the jury was entitled to conclude that it was only fortuitous that the bullet first passed through the victim's arm, which was in front of his chest, before entering his chest and killing him. See <u>People v. Walker</u>, 170 A.D.2d 362 (1st Dep't 1991) (intent to kill inferred despite fact that defendant shot victim in torso through wooden panel behind which victim was standing).

In sum, there was legally sufficient evidence of defendant's guilt, and the jury's verdict was in accordance with the weight of the evidence. Accordingly, defendant's judgment of conviction should be affirmed.

POINT V

**THE IMPOSITION OF CONSECUTIVE SENTENCES WAS PROPER. MOREOVER, DEFENDANT'S SENTENCE CONSTITUTED AN APPROPRIATE EXERCISE OF THE TRIAL COURT'S DISCRETION.**

The trial court properly sentenced defendant to consecutive terms of imprisonment for his convictions of first-degree murder and second-degree weapon possession because there was sufficient evidence adduced at trial to establish that those crimes were separate and distinct acts. Thus, contrary to defendant's claim, the imposition of consecutive sentences for those convictions did not violate section 70.25(2) of the Penal Law. Moreover, in light of the gravity of defendant's crimes, his criminal history, and his lack of remorse, and in light of the fact that the court could have sentenced him to life imprisonment without the possibility of parole, the lesser sentence actually imposed upon him constituted an entirely appropriate exercise of the trial court's discretion.

A.    The Imposition of Consecutive Sentences was Proper.

The imposition of consecutive sentences for defendant's convictions of first-degree murder and second-degree weapon possession was not in violation of section 70.25(2) of the Penal Law. That section of the Penal Law prohibits the imposition of consecutive sentences where the offenses underlying the sentences

were "committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other. . ." See People v. Laureano, 87 N.Y.2d 640, 643 (1996). The statute does not, however, prohibit consecutive sentences under circumstances in which, although committed during the course of a single transaction, the crimes were not part of a single act. See People v. Ramirez, 89 N.Y.2d 444, 451 (1996). Because defendant's convictions for second-degree criminal possession of a weapon and first-degree murder did not arise from a single act, nor was either offense a material element of the other, the imposition of consecutive sentences for those crimes was proper. See People v. Salcedo, 92 N.Y.2d 1019 (1998) (affirming consecutive sentence for murder and second-degree weapon possession where defendant chased victim with gun before killing her); People v. Mack, 242 A.D.2d 543 (2d Dep't 1997) (affirming consecutive sentences for second-degree weapon possession and manslaughter).

In this case, the weapon possession and murder convictions did not arise from a single act. The evidence adduced at trial established that defendant and his accomplices drew their guns, announced a robbery and robbed the victims' of their possessions, including Mr. Caesar's and Mr. Rosiclair's watches and Ms. Chung's earrings. The evidence also established that defendant

hit Mr. Rosiclair in the face with his gun. The evidence further established that defendant attempted to snatch Mr. Rosiclair's necklace. Finally, the evidence established that defendant then shot Mr. Rosiclair. Thus, defendant's act of possessing the gun with the intent to use it unlawfully was complete as soon as he and his accomplices drew their guns and announced the robbery, which occurred some time before the murder. See People v. Chronopoul, 181 A.D.2d 686 (2d Dep't 1992). Moreover, defendant's act of possessing the gun with the intent to use it unlawfully was certainly complete when he hit Mr. Rosiclair in the face with the gun. Accordingly, the weapon-possession conviction and the murder conviction did not arise from a single act, but instead arose from separate and distinct acts.

Nor did either offense constitute a material element of the other. "[T]he commission of one offense is a material element of a second for restrictive sentencing purposes if, by comparative examination, the statutory definition of the second crime provides that the first crime is also a necessary component in the legislative classification and definitional sense." People v. Day, 73 N.Y.2d 208, 211 (1989).

The material elements of second-degree criminal possession of a weapon in this case were defendant's possession of a loaded firearm with the intent to use the firearm unlawfully against another. See P.L. § 265.03(2).

The material elements comprising first-degree murder in this case were defendant's intentional killing of another during the course of committing or attempting to commit a robbery. See P.L. § 125.27(1)(a)(vii).

Thus, because no weapon is required to commit that crime, defendant could have been found guilty of first-degree murder even if he had killed his victim with his bare hands during the course of committing or attempting to commit the robbery. Accordingly, defendant's possession of a gun was not a material element of his first-degree murder conviction.

Similarly, defendant could have been convicted of second-degree robbery even if he had not killed Mr. Rosiclair. Defendant had already completed the crime of second-degree criminal possession of a weapon when he and his accomplices robbed the victims of their watches and other possessions. Moreover, had the police arrested defendant at the very moment he drew his gun and announced the robbery, he could have properly been convicted of second-degree criminal possession of a weapon. Indeed, had the police arrested defendant even before he drew his gun, he could have been convicted of second-degree criminal possession of a weapon. See P.L. § 265.15(4); People v. Topsy, 265 A.D.2d 353 (2d Dep't 1999); People v. Gibbs, 254 A.D.2d 209 (1st Dep't 1998). Certainly, when defendant hit Mr. Rosiclair in the face with the gun, his possession of the gun with the intent to use it

unlawfully was complete. Thus, in this case, the murder was not a necessary element of the second-degree criminal possession of a weapon.

Accordingly, defendant's convictions for second-degree criminal possession of a weapon and first-degree murder did not arise from a single act, nor was either offense a material element of the other. See People v. Perez, 278 A.D.2d 2 (1st Dep't 2000) (affirming consecutive sentences for second-degree weapon possession and manslaughter where defendant aimed gun at victim, struggled with victim over gun, and then shot victim at end of struggle); People v. Fecunda, 226 A.D.2d 474 (2d Dep't 1996); People v. James, 211 A.D.2d 824 (2d Dep't 1994) (affirming consecutive sentences for manslaughter and second-degree weapon possession where defendant in single incident fired gun at one set of people and then fired gun at second set of people, killing someone in second set).

Although in this case the fact that defendant robbed his victims is what partially supported the intent-to-use-unlawfully element of defendant's weapon-possession conviction and robbery was the aggravating element of his first-degree murder conviction, nevertheless, the statutory elements of the two convictions were discrete from each other. Defendant could have been convicted of second-degree weapon possession even if he had not attempted to steal Mr. Rosiclair's necklace, because he and his accomplices had

already stolen at gunpoint other valuables from the victims, including Mr. Caesar's watch and because defendant hit Mr. Rosiclair in the face with the gun. Thus, defendant could have been convicted of second-degree weapon possession, even if he had not robbed or killed Mr. Rosiclair, because, by robbing the other victims, he evinced an intent to use the gun unlawfully against them. Moreover, defendant's intent to use the gun unlawfully was independently established when he hit Mr. Rosiclair in the face with the gun.

Similarly, defendant could have been convicted of first-degree murder even if he and his accomplices had not stolen anything, because he killed Mr. Rosiclair while attempting to rob Mr. Rosiclair of his necklace.

Accordingly, because there were multiple victims of multiple robberies, an assault with the gun, and an attempted robbery, the facts evincing defendant's intent to use his gun unlawfully was not necessarily the robbery or attempted robbery that supported his first-degree murder conviction. See People v. Pons, 68 N.Y.2d 264, 267-68 (1986) (second-degree weapon possession conviction affirmed where, although defendant may have been justified when he fired weapon, defendant may have formed an unlawful intent to use weapon at time prior to justified shooting); People v. Almodovar, 62 N.Y.2d 126, 130 (1984); People v. Samwell, 287 A.D.2d 663 (2d Dep't 2001) (once criminal

possession of a weapon with the intent to use it unlawfully is established, "the possessory crime is complete and any unlawful use of the weapon thereafter is punishable as a separate crime"); People v. Hill, 245 A.D.2d 464 (2d Dep't 1997) (defendant who robbed two people in same incident was properly sentenced to consecutive sentences for each robbery). Therefore, in this case, the statutory elements of the two charges are categorically discrete from each other, "and the absence of legislatively declared interdependence in their definitions is evident, compelling an interpretation that consecutive sentences is not forbidden here." People v. Day, 73 N.Y.2d at 211 (citations omitted).

In sum, the imposition of consecutive sentences for the murder and weapon-possession convictions did not violate section 70.25(2) of the Penal Law. Accordingly, the trial court's imposition of consecutive sentences should be upheld.

B.  Defendant's Sentence Constituted an Appropriate Exercise of the Trial Court's Discretion.

The trial court appropriately sentenced defendant to an indeterminate term of imprisonment of twenty-five years to life on the murder conviction and a consecutive determinate term of fifteen years on the weapon-possession conviction. The trial court also appropriately sentenced defendant to a consecutive term of imprisonment of one and one-third to four years on a

violation of probation on a youthful offender adjudication for criminal possession of a controlled substance in the third degree under Kings County Indictment Number 7158/96. The trial court further appropriately ordered that the above terms of imprisonment run consecutively with an indeterminate term of imprisonment of five to fifteen years previously imposed on another violation of probation under Kings County Indictment Number 982/97.

The determination of an appropriate sentence is a matter resting within the discretion of the trial court and should not be disturbed absent a clear abuse of that discretion. People v. Farrar, 52 N.Y.2d 302 (1981); People v. Suitte, 90 A.D.2d 80 (2d Dep't 1982). The trial court is in the best position to assess the appropriate sentence based on its observation of the defendant and its superior knowledge of the facts and circumstances of the underlying conviction. People v. Junco, 43 A.D.2d 266, 268 (1st Dep't), aff'd, 35 N.Y.2d 419 (1974), cert. denied, 421 U.S. 951 (1975).

The sentencing court must consider the crimes charged, the particular circumstances of the offender, and the purpose of the penal sanction. See People v. Farrar, 52 N.Y.2d at 305; People v. McConnell, 49 N.Y.2d 340, 346 (1980); People v. Suitte, 90 A.D.2d at 83. The sentencing transcript establishes that the sentencing court did just that in determining defendant's sentence (S. 12-17.

In light of the gravity of defendant's crimes, his criminal history, his lack of remorse, and the fact that the court could have sentenced him to life imprisonment without the possibility of parole, the sentences imposed upon him constituted an entirely appropriate exercise of the trial court's discretion.

This case concerns a particularly vicious murder. Defendant and his gang planned the robbery, followed the victims from the nightclub, and robbed them at gunpoint. Defendant hit Mr. Rosiclair in the face with his gun and then cold-bloodedly shot him to death although he was not at all resisting the robbery. In fact, Mr. Rosiclair assured defendant that he would give defendant whatever he wanted and begged defendant to spare his life. Before defendant shot Mr. Rosiclair, Mr. Rosiclair had already given defendant his watch and was trying to rip the necklace he was wearing from around his neck to give to defendant when defendant moved his body back, raised his arm, aimed his gun at Mr. Rosiclair's chest, and executed him at point blank range. This senseless killing deserves the strongest condemnation.

In addition, at the time of defendant's arrest for the present crimes, he was a fugitive who had absconded from the court after being convicted of another crime. Indeed, defendant was on probation for other convictions when he committed the present crimes. Moreover, after defendant committed the present crimes he was arrested in Upstate New York on charges of crimes

he committed there. Accordingly, defendant has amply demonstrated his inability to be rehabilitated and his disdain for society, the court, and the criminal justice system.

Defendant also expressed no remorse for the killing. Indeed, at sentencing, defendant mocked the victim's family, telling them that he would help them find the real killer (S. 11-12). See People v. Oliver, 139 A.D.2d 536 (2d Dep't), lv. denied, 72 N.Y.2d 864 (1988) (trial court did not abuse its discretion in sentencing the defendant to maximum term, in light of heinous nature of crime and defendant's lack of remorse).

Moreover, the jury convicted defendant of first-degree murder. Thus, the trial court could have sentenced defendant to the much harsher punishment of life imprisonment without the possibility of parole. See P.L. § 70.00(5). Accordingly, the trial court has already granted defendant great leniency.

Accordingly, the court was properly acting within its discretion in sentencing defendant to the sentence it imposed -- which was much more lenient than the sentence that it could have imposed of life imprisonment without the possibility of parole -- for the three separate convictions he was sentenced on. See People v. Suitte, 90 A.D.2d at 85-87. Accordingly, defendant's sentence should not be disturbed.

## CONCLUSION

**FOR ALL OF THE ABOVE REASONS, DEFENDANT'S JUDGMENT OF CONVICTION AND SENTENCE SHOULD BE AFFIRMED.**

Dated:   Brooklyn, New York
         September 17, 2002


                    Respectfully submitted,


                    CHARLES J. HYNES
                    District Attorney
                    Kings County



LEONARD JOBLOVE
SOLOMON NEUBORT
Assistant District Attorneys
      of Counsel